Andrew Scott KRANK, David E. Braaten, Director of Grand Forks County Social Services Board, Guardian ad Litem for Andrew Scott Krank, Plaintiffs,

and

Annette Jones, Plaintiff and Appellant,

. v.

Bruce C. KRANK, Defendant and Appellee.

Civ. No. 940159.

Supreme Court of North Dakota.

March 16, 1995.

Faron E. Terry, Omdahl & Terry, Grand Forks, for plaintiff and appellant. Appearance by Annette Jones, appellant.

Shirley A. Dvorak, Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, for defendant and appellee.

VANDE WALLE, Chief Justice.

Annette Jones appealed from a judgment awarding joint legal custody and sole physical custody of her son, Andrew Scott Krank, to his father, Bruce C. Krank. We reverse the judgment and remand to the trial court for further findings and reconsideration of the custody award.

Bruce and Annette, who have never been married to each other, met in 1983 while living in Dickinson and started dating in 1985. At that time, Annette was 24 years old and Bruce was 30 years old. Annette was married to David Jones, but had been separated since 1982. Annette and David did not obtain a divorce until 1993. Annette lived with her two young daughters, Jill Schaub, born in 1979, and Jasmine Jones, born in 1980. Bruce also had a young daughter, Melissa Krank, born in 1979, who resided out of state with her mother. Bruce had extended summer visitation rights with Melissa.

During their relationship, Bruce and Annette were heavily involved in alcohol and drug usage. After living together for three months in 1985, their relationship turned stormy, the couple got into frequent arguments, and Annette lived with another man

in Dickinson for a short period of time in 1986.

Each party accused the other of physical abuse during their relationship. Annette testified about several instances of physical abuse committed by Bruce between 1986 and 1988 and obtained a temporary adult abuse protection order against him in June 1988. Annette testified about fights they had during which Bruce broke her fingers. She testified Bruce had raped her on more than one occasion. She also testified Bruce threw ash trays and glasses at her in a bar where she worked and grabbed her by the hair and pushed her into the side of the bar, bruising her face. Bruce denied Annette's allegations and testified he had never slapped or struck Annette. According to Bruce, the only time he became physically abusive with Annette was once when he pushed her against a wall in 1986. He also testified about being attacked by Annette on one occasion and that police officers "pulled her off" of him. He testified Annette threw glasses at him in the bar. Annette testified that she had slapped Bruce once and on another occasion threw a glass of tea at him.

While the protection order was still in effect, Annette and Bruce continued to initiate contacts with each other. In July 1988, Bruce received a gunshot wound in the hip from a small caliber handgun during an incident with Annette. According to Annette, Bruce confronted her while she was with another man and wanted to exchange personal items that had been in each other's possession. Annette testified that, after threatening the other man, Bruce grabbed her by the hair and threw her in his pickup and drove to his farm, telling her "he was going to fuck me one more time before he got rid of me." While scuffling in the pickup, Annette was sitting on the gun which Bruce had returned to her along with a knife earlier that evening. Annette testified she could feel the gun and "reached around and grabbed the gun to get it off the seat and he grabbed my arm and the gun went off." Annette drove Bruce to the hospital for treatment.

According to Bruce, he and Annette had gotten together merely to exchange personal items and he unloaded the gun before re-turning it to her. They drove around and talked, ending up at his farm. Bruce left the pickup to go to the bathroom and when he returned, "I got this gun pointed right at my head and [was] being cussed at." When he put his hand up to brush the gun away, "I got shot in the hip point-blank." Although investigated by the police, the incident resulted in no criminal charges being filed against either party.

Shortly after the shooting, Annette moved to Grand Forks and attended school, ultimately obtaining an associate of arts degree in medical administration. The couple continued to see each other approximately once every two months. In May 1989, when Annette drove to Dickinson to have Bruce fix her car, Andrew was conceived. Andrew was born on February 6, 1990. Bruce was in the delivery room when Andrew was born and visited him in Grand Forks after his birth. In August 1991, Annette and the children moved back to Dickinson and lived with Bruce until February 1992, when Annette and the children returned to Grand Forks. There was no evidence of physical abuse between the couple following the 1988 shooting incident, but Annette testified "there was emotional and mental abuse after that."

Bruce married his present wife, Becky, in December 1992. They, along with Becky's two daughters from a prior marriage, reside in rural Dickinson. At the time of trial, Bruce had recently lost a job but received income from his small farm and ranch operation and from hauling truck loads while looking for other employment. Becky has a full time job. Annette now lives with Carey Moran near Grand Forks along with her two daughters. Carey has a young son who lives with the child's mother and her husband, but Carey has no contact with the child. At the time of trial, Annette was not employed but received child support payments for the two girls and unemployment compensation. Carey has a full time job.

After Annette left Dickinson in February 1992, Bruce had difficulty visiting Andrew. Annette, through the regional child support enforcement unit, sought child support from Bruce, and Bruce moved the court for a change in custody. This was resolved by

stipulation in which the parties agreed that Bruce would have custody of Andrew for six weeks and Annette for two weeks during each two month period until Andrew started school, at which time Bruce would have physical custody for nine months and Annette for three months each year. Shortly after the stipulation, Annette requested, and the trial court allowed her, to withdraw from it. The trial court continued the same custody arrangement as a temporary order pending the final custody determination.

According to Bruce, he no longer drinks excessively or frequents bars on a regular basis. He testified that he has quit using drugs. According to Annette, she has also changed. Annette testified she only goes out once a week and occasionally drinks a beer at a bar while playing darts. The guardian ad litem testified that one of the persons she contacted told her that Annette was late for a visitation exchange of Andrew in Jamestown because, according to Jasmine, "Mom had to go back home and get her weed." Jasmine testified she did not remember making that statement. According to the guardian ad litem, this person also informed her that he had recently seen Annette in a Grand Forks area bar when one of her daughters telephoned for Annette. Instead of answering the call, Annette "signaled 'tell them I'm not here.'"

The trial court treated this case as an original custody proceeding rather than a change of custody proceeding. The court noted the "turbulent relationship" between the parties through 1988 and that both "were abusing alcohol and drugs." The court did not make any findings about specific acts of violence perpetrated by either party, except with respect to the shooting incident. The court found only that "Annette shot Bruce with a small pistol." However, the court did vaguely observe that "Bruce minimizes the domestic violence and alcohol and drug use that he did" and that "Annette too also appears to minimize in this area." The court said it agreed with the guardian ad litem that the case was "most troublesome," and that

both "parents have attempted to make themselves look better than the actual evidence indicates," but found "[i]t appears that Bruce has gotten his life more under control."

The trial court recognized the N.D.C.C. § 14–09–06.2(1)(j) rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child, and applied the presumption only against Bruce, ruling:

"[T]he presumption against awarding custody to Bruce Krank has been rebutted by the following:

"1. The domestic violence happened over five years ago, even before Andrew was born.

"2. There has not been any domestic violence in front of the child Andrew.

\* \* \* \* \* \*

"4. The guardian, after observing the situation in the parties' homes, expresses safety concerns with leaving the child in the mother's care."[1]

The trial court awarded the parties joint legal custody of Andrew, but awarded Bruce sole physical custody with visitation rights for Annette. Annette appealed.

■ A trial court's child custody decision fact finding will not be set aside unless it is clearly erroneous under N.D.R.Civ.P. 52(a). *Simons by and through Simons v. Gisvold*, 519 N.W.2d 585 (N.D.1994). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, has a definite and firm conviction that the trial court has made a mistake. *Ludwig v. Burchill*, 514 N.W.2d 674 (N.D.1994).

Section 14–09–06.2(1)(j), N.D.C.C., provides:

"1. For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the

---

1. The trial court also found that "[t]he guardian upon observing the parents interact with the child indicates that there is more love and affection between Bruce and the child." Bruce con-

cedes that this finding is clearly erroneous because the guardian ad litem stated both parents love Andrew and Andrew loves both of his parents.

best interests and welfare of the child. These factors include all of the following when applicable:

\* \* \* \* \* \*

"j. Evidence of domestic violence. In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent. The court shall cite specific findings of fact to show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence. If necessary to protect the welfare of the child, custody may be awarded to a suitable third person, provided that the person would not allow access to a violent parent except as ordered by the court. If the court awards custody to a third person, the court shall give priority to the child's nearest suitable adult relative. The fact that the abused parent suffers from the effects of the abuse may not be grounds for denying that parent custody. As used in this subdivision, 'domestic violence' means domestic violence as defined in section 14-07.1-01."

"Domestic violence" includes "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault, not committed in self-defense, on the complaining family or household members." N.D.C.C. § 14-07.1-01(2).[2]

In *Heck v. Reed,* 529 N.W.2d 155 (N.D. 1995), this court interpreted the 1993 legislative amendments to this statute that were enacted after the court's decision in *Schestler v. Schestler,* 486 N.W.2d 509 (N.D.1992). The *Heck* court determined that, by imposing

a clear and convincing evidence standard and by using the word "require," the "legislature intended not only that domestic violence committed by a parent weigh heavily against that parent's claim for child custody, but that it be overcome only by clear and convincing evidence that the best interests of the children demand that the perpetrator of domestic violence serve as custodial parent." *Heck, supra,* at 162. The court concluded that the *Schestler* court's construction of the law that proof of domestic violence carried no more weight than the other statutory factors and could be overcome by any one or a combination of other statutory factors in N.D.C.C. § 14-09-06.2(1)(a) through (i), (k), and (*l*), had been legislatively overruled.

■ A trial court is therefore not permitted "to find that both parents have the ability and affection to raise the children appropriately and then, to find that the statutory presumption against awarding custody to the parent who has perpetrated domestic violence is rebutted by weighing in the perpetrator's favor some of these remaining customary best-interests factors." *Heck, supra,* at 163. Rather, "the statutory presumption against awarding custody to a perpetrator of domestic violence may be rebutted, in the case of two fit parents, only by compelling circumstances demonstrating that the best interests of the children require that custody be placed in the perpetrator." *Heck, supra,* at 163. The practical effect of the court's interpretation of the statute is that the perpetrator of domestic violence cannot be awarded custody of a child unless the other parent is found to be an unfit parent. *Heck, supra,* at 166 (VandeWalle, C.J., concurring in result).

■ To the extent the trial court's application of the presumption only against Bruce implies a finding that only Bruce committed domestic violence, we believe the trial court's reasoning in this case is insufficient to support its determination that the presumption against awarding custody to Bruce has been rebutted.

---

**2.** Self defense would include, where supported by the facts, the battered spouse syndrome. *See,*

*e.g., State v. Leidholm,* 334 N.W.2d 811 (N.D. 1983).

That the domestic violence occurred more than five years ago, and before Andrew was born, does not alone necessarily overcome the presumption. In *Heck*, the court dismissed a similar argument that, because the most recent episode of domestic violence occurred two years before the custody hearing, there was little likelihood of continued violence toward anyone. After noting that domestic violence is a learned behavioral pattern that possibly can be "unlearn[ed]," the court said the absence of evidence that the perpetrator had considered or participated in any form of treatment program or counseling related to domestic violence made it clearly erroneous to conclude that the perpetrator "will no longer use domestic violence as a means of controlling his intimate partners." *Heck, supra*, at 165 (footnote omitted). Recognizing that treatment is not a fail-safe remedy, the court said that treatment may, under certain circumstances, support a finding that domestic violence is not likely to occur in the future. *Heck, supra*, at 165 n. 6. In this case, Bruce introduced no evidence suggesting he had considered or participated in any form of treatment program or counseling for domestic violence.

■ Likewise, that there has not been any domestic violence witnessed by Andrew does not overcome the presumption. In *Heck, supra*, at 164 (emphasis in original), the court recognized that "children suffer [an inherent] harm even when they do not witness ... [domestic] violence," and that the "legislature intended that courts *presume* that *any* domestic violence negatively impacts the best interests of the children." As the court noted in *Heck, supra*, at 164, "a child placed in the custody of a perpetrator of domestic violence remains at risk." Andrew's lack of directly viewing any incidents of domestic violence does not mean that he will not suffer any harm from the statistical likelihood of Bruce committing future acts of domestic violence. *See Heck, supra*.

■ We also do not believe the trial court's finding about the guardian ad litem's "safety concerns" in leaving Andrew in Annette's care is sufficient to rebut the presumption. The only safety concern expressed by the guardian ad litem involved the absence of "reliable transportation in emergencies and those kinds of things," and the guardian ad litem testified that she actually did not consider this "a problem because [Annette] testified she's not had any problems." The guardian ad litem did express moral concerns regarding Annette's choice to involve her children in her lifestyle, including the alcohol and drug use, the people who were involved in the household, and the kind of care the girls were receiving, which to the guardian revealed that Annette's interests were generally placed ahead of her children. The trial court also noted that Annette's three children each has a different father. But the trial court did not find that Annette is a morally unfit parent under N.D.C.C. § 14–09–06.2(1)(f), because of these concerns. Rather, the trial court said it did "not judge Annette's relationship with Car[e]ly to be necessarily immoral," but said "it does not set an acceptable standard for the children and its lack of designated commitment is troublesome." The court viewed the best interests decision as a close question, giving the "edge" to Bruce. Absent more specific findings on this matter, we conclude that the "safety concerns" of the guardian ad litem do not overcome the presumption.

Because the custody determination in this case was induced by an erroneous view of the law as interpreted in *Heck*, the trial court must reconsider its custody award. Furthermore, the trial court must make more specific findings on other matters that appear in the record.

There is evidence which, if believed, constitutes credible evidence of domestic violence on the part of Annette. Annette testified that she slapped Bruce and threw a glass of tea at him, apparently at times when she was not attempting to defend herself. The trial court appears to have recognized this in its statement that "Annette too also appears to minimize in this area" of domestic violence and alcohol and drug use. There is also evidence that Bruce was shot with a gun being handled by Annette, although the parties have differing explanations of what led to that incident. The trial court's only specific finding of an act of violence perpetrated by either party against the other is that "An-

nette shot Bruce with a small pistol." The trial court did not further decide whether Annette either intentionally shot Bruce without provocation or accidentally shot him while attempting to ward off a rape. Curiously, the trial court then went on to apply the statutory presumption only against Bruce.

When there is credible evidence of domestic violence on the part of both parents, findings that ambiguously allude to the issue are insufficient to support a custody award. Rather, the trial court must make detailed findings on the domestic violence issue. Section 14–09–06.2(1)(j) does not specifically address the amount or extent of domestic violence required to trigger the statutory presumption, nor does it set forth a procedure for handling circumstances where domestic violence is committed by both parents. Under the plain wording of the statute, a single act of domestic violence may suffice to invoke the presumption. *Compare Simmons v. Simmons,* 649 So.2d 799, 801 (La.Ct.App.1995) (single past act of "family violence" does not constitute "history of perpetrating family violence" under statute sufficient to trigger presumption).

Thus, we believe a proper construction of the statute requires that if domestic violence has been committed by both parents, the trial court measure the amount and extent of domestic violence inflicted by both parents. If the amount and extent of domestic violence inflicted by one parent is significantly greater than that inflicted by the other, the statutory presumption against awarding custody to the perpetrator will apply only to the parent who has inflicted the greater domestic violence, and will not apply to the parent who has inflicted the lesser. However, if the trial court finds that the amount and extent of the violence inflicted by one parent is roughly proportional to the violence inflicted by the other parent, and both parents are otherwise found to be fit parents,

the presumption against awarding custody to either perpetrating parent ceases to exist.[3] In such a case, the trial court is not bound by any presumption, but may consider the remaining customary best-interests factors in making its custody decision.

We do not intend to suggest that a slap in the face is roughly proportional to rapes and physical beatings, if, in fact, the trial court finds that those incidents did occur. But an unjustified shooting, if that is what the trial court finds transpired here, might reasonably be considered to be roughly proportional to those acts of domestic violence. These are factual determinations that must be made by the trial court in order to appropriately resolve the custody dispute in this case.

Accordingly, we reverse and remand to the trial court for further findings and reconsideration of the custody award.

MESCHKE and LEVINE, JJ., concur.

SANDSTROM, J., concurs in the result.

MESCHKE, Justice, concurring.

I largely concur with the majority opinion on the effect of the domestic-violence presumption. I write separately to express my understanding about how the presumption should work in a difficult case like this one.

Most parents are imperfect to some degree. Yet the Legislature has wisely decreed any imperfection resulting in family violence cannot be permitted. While that is an ideal to be desired, judges are handicapped by separation in space and time in patrolling family conflict. Still, judges are empowered to attach rigorous consequences to past conduct when convinced that it occurred.

Therefore, I join in the majority's view of the statutory presumption, just as I joined in the majority opinion in *Heck v. Reed.* A trial court must make detailed and specific find-

---

**3.** This approach is not unique. For example, Missouri Revised Statutes § 455.050.5 (1994) provides:

"5. In making an award of custody, the court shall consider all relevant factors including the presumption that the best interests of the child will be served by placing the child in the custody and care of the nonabusive parent, *unless there is evidence that both parents have engaged in abusive behavior, in which case the court shall not consider this presumption but shall consider all other factors....*" (Emphasis added).

ings about the degree of family violence whenever the subject comes up in a child-custody case.

A single act of family violence may suffice to apply the presumption against custody to a violent parent if the act is significant enough and not too remote. Yet reciprocal violence between parents has little bearing on the custody choice between them, unless the degree of violence by one is "significantly greater" than the other. "Roughly proportional" violence between parents effectively should defeat the statutory presumption, unless the mutual violence is so severe that it disqualifies both as unfit parents. Whether both parents are unfit will usually be adjudged only when the child is so deprived that the proceedings turn to terminating all parental rights.

Although the statute is silent about reciprocal violence, when the dispute is over the choice between parents for primary physical custody, equivalently violent conduct between them (not directed at the child or another household member) will rarely disqualify both. No other interpretation of the statute is manageable. On the other hand, I expect that there will often be a "significantly greater" degree of violence by one parent toward the other.

If this trial court sought to say the violent conduct of these parents was "roughly proportional," or the degree of Annette's violence significantly exceeded Bruce's, then this custodial placement was correct and should be continued. Therefore, this reversal and remand should not be understood to foreordain the result.

The majority opinion simply requires the trial court to focus its findings more carefully and more specifically on the degree of violent behavior by each parent, as the statute requires, in order to identify the preferable custodian for five-year-old Andrew. While those harsh characterizations may be unpleasant findings for a trial court to make, somewhat reminiscent of our former fault-based divorce laws, the statute clearly compels "specific findings of fact" to protect the victim *and* the child.

As I understand the majority opinion, our reversal here does not stay the current custodial placement, nor does it compel the trial court to place custody with Annette. On this record, the final findings and dispositional placement remain for the trial court to make. With that understanding, I join in the majority opinion.

NEUMANN, Justice, concurring.

I agree with much of the majority's opinion, especially as it relates to the application of section 14–09–06.2(1)(j) when both parties have committed domestic violence. I write separately to address a concern about passage of time.

In this case the trial court found that the domestic violence committed by Bruce occurred more than five years ago. The majority, relying on *Heck v. Reed*, 529 N.W.2d 155 (N.D.1995), seems to suggest that the mere passage of time, unless it is combined with treatment or counseling, can never serve to avoid imposition of the statute's presumption, or help to rebut that presumption. I agree that the passage of a short time, like the two years in *Heck*, is proof of very little, unless it is combined with convincing evidence of successful treatment. On the other hand, I would find the passage of five years somewhat more convincing proof that a violent person's behavior may have changed. Longer time periods would be particularly convincing if they were combined with affirmative evidence that no further domestic violence had occurred during that time.

I do not quarrel with the idea that behavior is unlikely to change without some prompting. Experience certainly suggests that is true. But experience also suggests that the motivating factor for change can be many things other than formal treatment or counseling. I would not want to suggest that only treatment or counseling is capable of negating past domestic violence, no matter how long ago it may have been committed.