**Deborah Dee HELBLING, Plaintiff and Appellant,**

v.

**Dale Robert HELBLING, Defendant and Appellee.**

Civ. No. 940166.

Supreme Court of North Dakota.

May 31, 1995.

Irvin B. Nodland (argued), Bismarck, for plaintiff and appellant.

Dwight C.H. Kautzmann (argued), Bismarck, for defendant and appellee.

MESCHKE, Justice.

Deborah Helbling appealed from a divorce decree placing primary custody of her daughter, Deidre, with Dale Helbling, Deidre's father. We reverse and remand for reconsideration of custody because the trial court failed to act on extensive evidence of domestic violence.

Deborah and Dale were married in February 1984, and Deidre, their only child, was born December 8, 1986. Deborah filed for divorce in November 1992. Her complaint alleged that Dale "frequently physically and mentally abused" her, and she sought custody of Deidre. Dale counterclaimed for a divorce too, denied the allegations of abuse, and asked for custody of Deidre. After a four-day trial in April 1994, the trial court decreed a divorce, placed primary custody of Deidre with Dale, and scheduled visitation with Deidre for Deborah. Deborah appeals only the placement of primary custody.

Child custody is a finding of fact that will not be disturbed on appeal unless clearly erroneous. *Leppert v. Leppert,* 519 N.W.2d 287 (N.D.1994). A finding of fact is clearly erroneous if this court is left with a definite and firm conviction a mistake has been made,

or if the finding was induced by an erroneous view of the law. *McAdams v. McAdams,* 530 N.W.2d 647 (N.D.1995). The trial court failed to make detailed findings of fact about a key feature of this case.

Deborah chiefly contends Deidre's custody was wrongly placed with Dale because Deidre is more closely bonded with Deborah as her primary caregiver for over seven years, and she has had sole custody of Deidre during the year and a half of separation before the divorce. Deborah compares her circumstances with Dale's:

> [He is] a brakeman-engineer for Burlington Northern Railroad. He had no home of his own and was living with his brother in Mandan. He is usually out of town from 60–75 hours *each week.* When home he often sleeps for eight hours, often during the day, before going on his next out-of-town run. In his free time, he often engages in his hobbies of hunting, fishing and trapping.
>
> Because of his absentee schedule, at trial, the father proposed a "plan." He would buy a house. He would hire a full-time nanny whose identity was then unknown. This nanny would be with the child when he was gone.

In addition, Deborah asserts Dale has a long history of drug and alcohol abuse, and "is a physical and emotional abuser."

Answering in kind, Dale argues Deborah "did not address her manipulative behavior, or her oppositional and argumentative behavior, her average to below average intelligence, her immaturity, and impulsive behavior." Dale declares Deborah "needs long-term counseling and she is not as stable as" he is. Dale's appellate brief does not at all address the evidence of domestic violence marshalled by Deborah.

Because we conclude the extensive evidence of domestic violence in this record requires consideration and specific findings of fact, we do not reach all of the arguments made to us.

Deborah testified that Dale frequently abused her. She testified Dale would not allow her to reasonably spend money for household or personal items. For example, she testified Dale became angry about a 75 cent charge on the phone bill, then called Deborah "stupid" and "crazy," and physically assaulted her by "throwing me around." Deborah testified Dale became angry at the circus because Deidre would not sit in her seat. She said Dale made the family immediately leave and physically kicked both her and Deidre as they made their way to the parking lot. When they arrived home, said Deborah, Dale was still angry, whipped Deidre, causing welts on her body, and then he pushed Deborah out the garage door.

When asked for additional examples of Dale's violent conduct, Deborah told about a time when she and Deidre were looking at pictures in an upstairs bedroom:

> ... me and Deidre were sitting on the floor, and he came and grabbed me by my hair and he drug me down the steps. When I got to the bottom of the steps he threw me in front of the desk and then he kicked me and then I was supposed to prove to him that I didn't spend his money that day.

Deborah described another time when she came home from work and Dale wanted the sheets changed on the bed:

> I came downstairs, this was at our first home we owned, and he told me to get upstairs and get those sheets off the bed and I wasn't, I didn't know what was wrong with the ones that were on there and he threw me up the steps and he threw me up against the linen closet and then I grabbed the sheets and then he threw me into the bedroom and I hit my head on the bed and then he just told me to put the sheets on. But before this when we were downstairs he threw me up against the gun cabinet, told me I knew how to use a gun.

Theresa Porter, a social worker at the Abused Adult Resource Center who counseled Deidre, testified that Deidre told her Dale pulled Deborah "down the stairs by her hair." A neighbor, Stanley Vitez, testified about a time that Deborah "kind of broke down," told him Dale "dragged [her] down the steps," and showed him bruises on her back. Deborah's father, Donald Allmendinger, testified that he watched Dale spank Dei-

dre so hard that he would characterize it as a beating.

Dr. Pete Peterson, a psychologist testifying for Dale, agreed on cross-exam that the traits he found displayed by Deborah, ("suspicious," "evasive," "low self-esteem," "unassertive," "passive," "intimidated," "emotionally reactive," "anxious," and "angry feelings ... toward her spouse"), were characteristics often identified with a battered woman. Cassie Roberdeaux, a social worker experienced in working with victims of domestic abuse, testified about her extended counseling of Deborah, after she left Dale, about domestic violence and its effect on parenting. Dale denied most abusive acts toward Deborah, but he admitted that he had struck her three times during their marriage.

Dale testified that Deborah lies and embellishes incidents, uses disgusting language around Deidre, and calls Deidre terrible names to her face. A neighbor, Debra Hopfauf, testified that Deborah would yell obscenities and call Deidre names. When pressed for specifics, Hopfauf testified:

> She would yell knock it off, you fucking cunt. Shut up, you little fucking bitch. Things like this. Throughout the phone conversations.

Bill Rowe testified that Deborah once kicked Deidre so hard she fell to the ground. Karen Mueller, a social worker appointed by the court to conduct a study, asked Deidre if she was afraid of her mom or dad. Mueller testified that Deidre responded, "I'm mostly scared of mom because she's mean to me, screams at me, hits me. Bad mom." Mueller also testified that third parties reported physical abuse of Deidre by Deborah.

■ Dale urges "that in an original custody proceeding the fact finder is given free rein to weigh each factor of N.D.C.C. 14–09–06.2 as it deems fit." We disagree. The trial court must give paramount consideration to evidence of domestic violence and make specific findings to consider its effect on custodial placement. NDCC 14–09–06.2(1)(j).[1] This record contains extensive evidence of specific incidents of family violence. If accepted as true by the trier of fact, this evidence of domestic violence dictates that the court make specific findings in deciding custody of Deidre.

If the trial court finds domestic violence took place, there is a rebuttable presumption that outweighs other factors and prevents placing custody with an abusive parent. *Id.* Here, the trial court made no findings about domestic abuse in spite of extensive evidence. The court only said that it had considered "all the factors set forth in § 14–09–06.2 NDCC," Dale is "the more stable parent," and "the best interests" of Deidre would be

1. When this divorce action was begun in November 1992, a rebuttable presumption against awarding custody to an abusive parent was expressed in NDCC 14–05–22(3):

> In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates the rebuttable presumption that awarding custody or granting visitation to the abusive party is not in the best interests of the child.

The statutes were amended by S.L.1993, Ch. 144, and the presumption language was moved to NDCC 14–09–06.2(1)(j) and strengthened:

> 1. For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:
>
> *    *    *    *    *    *
>
> j. Evidence of domestic violence. In awarding custody or granting rights of visitation, the court shall consider evidence of domestic

> violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent. The court shall cite specific findings of fact to show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence....

served by placing legal custody with Dale. That is not enough.

 A trial court cannot ignore evidence of family abuse. The trial court must make specific findings on evidence of domestic violence in making its custody decision. *Heck v. Reed,* 529 N.W.2d 155 (N.D.1995) (the presumption against awarding custody to the perpetrator of domestic violence can be overcome only by compelling circumstances demonstrating that the child's best interests "require" custody placed with the perpetrator). Because the trial court failed to address the evidence of domestic violence here, as required by the law, we must reverse and remand for a partial new trial to redetermine custody of Deidre.

 If there is credible evidence of domestic violence by both parents, the trial court must "measure the amount and extent of domestic violence by both parents." *Krank v. Krank,* 529 N.W.2d 844 (N.D.1995). The rebuttable presumption will then apply only to the parent "who has inflicted the greater domestic violence, and will not apply to the parent who has inflicted the lesser." *Id.* at 850. If the court finds that the violence is "roughly proportional" and the parents are otherwise fit, then there is no presumption, and the trial court must look to the remaining factors affecting the best interests and the welfare of the child. *Id.* at 851. As in *Krank,* the extensive evidence of family abuse in this case must be specifically addressed and dealt with in the findings on remand.

On remand, a successor judge must be designated because, after deciding this case, the trial judge retired. A litigant is generally entitled to a decision on the facts by a judge who has heard and seen the witnesses. *Paulson v. Meinke,* 352 N.W.2d 191 (N.D. 1984). Still, the rules of procedure allow some latitude in recalling witnesses at the new trial:

> [T]he successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

NDRCivP 63. This procedure will apply on remand.

The judgment is reversed. This case is remanded to the trial court for a new trial to redetermine custody.

VANDE WALLE, C.J., and LEVINE and NEUMANN, JJ., concur.

SANDSTROM, J., concurs in the result.