Robert Ewald RYAN, Plaintiff
and Appellee,

v.

Elizabeth EW FLEMMING, Defendant
and Appellant.

Civ. No. 940274.

Supreme Court of North Dakota.

June 27, 1995.

Howe and Seaworth, Grand Forks, for plaintiff and appellee; argued by Mary E. Seaworth.

Tom P. Slorby (argued), Minot, for defendant and appellant.

MESCHKE, Justice.

Elizabeth Flemming appealed a decree placing primary physical custody of her son, Robert Jr., with his father, Robert Ryan. We consider the effect of a private judicial interview of a child witness without administering an oath, the effect of violence to property on the presumption against custody by a violent parent, and whether the evidence supported placement of primary custody of a five-year-old boy with his father. We affirm.

Robert and Elizabeth began a relationship in 1987, but never married. Their son, Robert Jr., was born on April 18, 1989. At the time Elizabeth had a six-year-old son, Jesse, from before. Robert Jr. lived solely with Elizabeth and Jesse until August 1989, when Robert and Elizabeth moved in together in Grand Forks. In June 1990, Elizabeth moved to Minot with her boys, where they lived until August 1991. Then, Robert took Robert Jr. back to Grand Forks to live with him.

The family soon came together again when Elizabeth and Jesse returned to Grand Forks to live there too, but later in 1991, Elizabeth moved to a separate apartment. For the next two years, Robert Jr. often went back and forth between the homes of his parents, but primarily lived with Robert. In late October 1993, Elizabeth again moved to Minot with Jesse, taking Robert Jr. with her against Robert's wishes. Robert sued Elizabeth for custody of the boy, and obtained his temporary custody pending trial. Elizabeth too sought custody of Robert Jr.

On the morning of trial in 1994, Jesse was interviewed briefly in the judge's chambers without Robert or Elizabeth present. Present were Jesse, an attorney for each parent, the court reporter, and the judge. At trial, Robert and Elizabeth both testified, and each described acts by Robert in breaking a potted plant once and in ripping a phone off the wall another time.

The trial court decreed joint legal custody of Robert Jr., placed his primary physical custody with Robert, and scheduled visitation with Elizabeth, who was ordered to pay $187 monthly child support. Elizabeth appeals.

Elizabeth argues that the trial court erroneously placed primary custody of Robert Jr. with Robert. In particular, she argues that the court erred in not putting Jesse under oath for the chambers interview, in excluding her from that interview, and in misapplying the presumption against placing custody with a violent parent. Robert responds that the court reasonably found insufficient violence by Robert for a presumption against his custodial fitness, and correctly placed Robert Jr.'s custody with Robert as the primary caretaker. We agree with Robert.

█ We will not reverse a trial court's custody placement, a finding of fact, unless it is clearly erroneous. *Heck v. Reed,* 529 N.W.2d 155, 159 (N.D.1995). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made." *Id.*

I

■ Elizabeth challenges use of evidence from Jesse's chambers interview because "[t]he trial Court did not administer an oath to Jesse, nor at any other time make any effort to ascertain if Jesse knew the difference between the truth and a lie or otherwise attempt to impress upon Jesse the importance of telling the truth." The rules of evidence expect that every witness be required "by oath or affirmation" to testify truthfully:

Before testifying, every witness must be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.

NDREv 603. While this rule was not literally followed, we are not persuaded the degree of omission for a child compels a new trial or a different result.

The trial court began his brief "talk with" Jesse, age ten, with some emphasis: "I just have a few questions for you, Jesse, and you can tell me as much as you like, and I appreciate it a lot because it's important." Jesse was thus instructed his answers would be important, even though he was not asked to make a solemn promise to tell the truth. Jesse's credibility was for the trial court to weigh. *See State v. Hanson*, 149 Wis.2d 474, 439 N.W.2d 133, 137 (1989) ("a child of tender years who is a witness need not be formally 'sworn' to fulfill the requirement" of an oath or affirmation). Wigmore's renowned work explains, at 6 Wigmore, Evidence § 1827 at 413–14 (Chadbourn rev. 1976): "The true purpose of the oath is not to exclude any competent witness, but merely to add a stimulus to truthfulness wherever such a stimulus is feasible."

If more stimulus was needed, counsel for Elizabeth was present at the interview, was able to question Jesse, and did not ask for any different procedure. *See Larsen v. State*, 686 P.2d 583 (Wyo.1984) (failure to swear five-year-old before testifying was not plain error). "It is generally held that the failure to require an oath or affirmation before testifying must be raised by objection or it is considered waived." *Id.* at 587. Jesse's

ability to answer questions truthfully was never contested.

And Jesse's answers were not the only evidence about family relations. After that brief interview, there was a complete trial. In its decision, the trial court explained how Jesse's statements fit with the rest of the testimony:

[I]t was the distinct impression of the Court that Jesse was stating the same concerns that his mother felt. Jesse complained that Robert had many toys and that Robert can do anything he wants at his father's home. Jesse complained about [Robert]'s unwillingness to pick him up from school or day-care. Moreover, Jesse thought hunting and guns are "stupid". Jesse stated that: "He (Robert) would tell you that he wants to stay with his dad."

.     .     .     .     .

[T]he Court is concerned about the apparent bitterness that [Elizabeth] feels toward [Robert]. This bitterness has, as noted above, spilled over into her conversations with Jesse, who reiterated his mother's concerns to the Court during the in-chambers interview.

The court used a complete analysis of the evidence for the custodial placement.

■ Elizabeth argues the trial court erred in excluding her from Jesse's interview. We disagree.

We discussed, without deciding, the potential problems that go with a private judicial interview of a child in a custody case in *Muraskin v. Muraskin*, 336 N.W.2d 332, 335 n. 2 (N.D.1983):

While the right to confrontation of witnesses is not a constitutional right in civil cases as it is in criminal cases, the procedure used here raises significant due process questions. A party to any procedure is entitled to know what evidence is used or relied upon and has a right generally to present rebutting evidence or to cross-examine unless such right is waived by the parties either expressly or by implication.

The *Muraskin* children were the subjects of the custody dispute, the record of their interview was sealed to fulfill the trial court's

assurance of confidentiality to the children, and the father objected to the secret procedure. In contrast, the subject of this custody dispute was not Jesse but was his younger half-brother, the record of the interview was available to transcribe for use and review, and counsel for Elizabeth did not object to her absence.

Elizabeth claims "[t]he record does not indicate that the parties were present, that they were given an opportunity to be present, or that they waived their right to be present." As the trial began, the trial court stated on the record that it "originally called the case in Chambers at which time the Court had an opportunity to interview Jesse, the child of Ms. Flemming; and counsel were present at that time, as well." The court said it was following "a road map that the Court ... outlined to the attorneys a couple of days ago in terms of the order of presentation of evidence." Elizabeth, through her attorney, was adequately notified that the trial court would privately interview Jesse, and she did not object to the procedure.

Her failure to object to how Jesse was interviewed was a waiver of any error. *Andrews v. O'Hearn*, 387 N.W.2d 716, 730 (N.D. 1986). Therefore, there is no reversible error from Jesse's private and unsworn interview.

## II

Elizabeth argues that the trial court misapplied NDCC 14–09–06.2(1)(j) on the weight to be given evidence of domestic violence in a decision on custody. We disagree.

■ In making an initial child custody placement, the trial court must "promote the best interests and welfare of the child." NDCC 14–09–06.1. To do so, a trial court must assess various relevant factors. NDCC 14–09–06.2. Still, in the hierarchy of factors to be considered, domestic violence predominates when there is credible evidence of it. *Helbling v. Helbling*, 532 N.W.2d 650 (N.D. 1995); *Heck v. Reed*, 529 N.W.2d 155 (N.D. 1995); *Krank v. Krank*, 529 N.W.2d 844 (N.D.1995). Part of NDCC 14–09–06.2(1)(j) commands:

In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent. The court shall cite specific findings of fact to show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence.

*See also* NDCC 14–05–22(3). NDCC 14–07.1–01(2) defines domestic violence as "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault, not committed in self-defense, on the complaining family or household members."

■ Even if the violent conduct did not harm anyone, if it threatened imminent harm to someone in the household, the presumption arises, must be addressed by specific findings, and can be overcome only by clear and convincing evidence that "the best interests of the child require [the violent] parent's participation as a custodial parent." NDCC 14–09–06.2(1)(j). Under NDREv 301(a), "the presumption substitutes for evidence of the existence of the fact presumed until the trier of fact finds from credible evidence that the fact presumed does not exist."

■ A finding by the trial court about domestic violence is a factual determination that will not be reversed unless clearly erroneous. *Heck v. Reed*, 529 N.W.2d at 159. Statutory interpretation is a matter of law that is fully reviewable on appeal. *Id.* at 160. We conclude the trial court in this case neither misinterpreted nor misapplied the domestic violence presumption.

■ Robert admitted that, in 1990 when Elizabeth intended to leave with both boys, he "broke one flower pot ... knocked it off a counter." Robert also testified, "I did pull the phone out of the wall once when Beth

told me she was leaving and taking off to Austin, Texas. That was back in 1989." Elizabeth described the incidents differently:

> Rob came home and he was angry because [the children] were digging up his yard. I said: They were trying to catch the worms as they were going down through the ground. I told him to leave them alone. They are being kids. He blew up, "The damn kid gets his way all the time." He just went wild. He pounded on the counter. I was holding Robert. I was standing in the kitchen. I honestly believe in my mind if I wasn't holding the baby, he would have hit me. When he said that, he knocked that flower pot on the floor. [He] pushed that flower pot across the kitchen. It went down the wall in the other room across the dining room.

Elizabeth testified that she feared for her and the boys' safety, and she moved out of the house that same day. She also said she hadn't been able to use the phone in the kitchen because Robert "smashed it through the wall when he was mad at me one time and so it was never repaired."

In 1990 when Elizabeth left Robert, the trial court understood "[she] was afraid of [Robert]," claiming that he had engaged in various violent acts resulting in property damage." The trial court concluded that "[t]here is no claim that there was ever any physical abuse. The Court does not find evidence of domestic violence sufficient to raise any presumption under the statute, N.D.C.C. § 14–09–06.2."

■ A choice between two permissible views of the evidence is not clearly erroneous. *Dalin v. Dalin*, 512 N.W.2d 685, 688 (N.D.1994). As NDRCivP 52(a) dictates, we respect the opportunity of the trial court to weigh the credibility of the witnesses.

The trial court recognized the predominant importance of domestic violence in considering the factors for placement of child custody. The court weighed conflicting evidence about the threatening nature of Robert's acts, and decided the acts were insufficient for the presumption. The acts inflicted no actual injury, were isolated and remote in time, and were viewable as demonstrative. The trial court made a specific finding that the acts were insufficient for the presumption. We affirm that finding.

### III

■ Elizabeth challenges the placement of primary custody as clearly erroneous. She acknowledges that Robert Jr.'s principal baby-sitter testified that each parent "kind of had [him] equal times" between 1991 and 1993, but argues that the "mere fact that one parent may have more time to spend with the child than the other due to a less demanding work schedule" is not determinative. She insists "any jealousy on the part of Jesse and problems [about] differences in the treatment of the two boys ... is not an uncommon situation of siblings of half blood" that does not justify the custodial placement with Robert.

While split custody of siblings is generally disfavored, *McAdams v. McAdams*, 530 N.W.2d 647 (N.D.1995), we have affirmed it in some cases of half-siblings. *See Kaloupek v. Burfening*, 440 N.W.2d 496 (N.D.1989) (half-siblings); *Worden v. Worden*, 434 N.W.2d 341 (N.D.1989) (half-siblings). *See also Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986) (siblings). We conclude the trial court carefully reasoned its decision here to place custody of Robert Jr. separately from Jesse.

The trial court found that Elizabeth had moved many times, changed jobs frequently, and showed a "lack of stability" without "a clear plan for her future." Her living arrangements were "certainly not in the best interests of the minor children," the court said, and her "personal life and her living situation are not nearly as stable as [Robert's]."

The trial court saw antagonism between Robert and Jesse, instigated by Elizabeth, and voiced "concern that [Elizabeth] has placed certain ideas and opinions in the mind of Jesse which places Jesse in the middle of her dispute with [Robert]." The court identified "the apparent bitterness that [Elizabeth] feels toward [Robert]" and expressed concern that Elizabeth's attitude "would also carry over ... to Robert Jr. in an effort to affect his relationship with his father."

After finding that Elizabeth "places Jesse in the middle of her dispute with" Robert, the trial court explained that "Robert Jr. lived a considerable length of time with both parents in Grand Forks, but his primary physical residence was with [Robert] from August 1991 until late October, 1993." The court reasoned each parent "would basically do the same things for Robert Jr." since "[t]hey both love him very much and want the best for him." Still, the court remarked on Robert's greater attention to his son's "educational needs," and reasoned that "[Robert] has been the primary physical caretaker of Robert Jr. since August 1991." We conclude the evidence supports this custodial placement.

We affirm.

VANDE WALLE, C.J., and NEUMANN, J., concur.

SANDSTROM, J., concurs in the result.

LEVINE, Justice, concurring specially.

I write specially to warn that this case should not be read to support the notion that the domestic violence presumption only arises when there is evidence of "physical abuse" or "actual injury."

The legislature has defined domestic violence broadly to include not only actual physical harm and bodily injury, but also "the infliction of fear of imminent physical harm, bodily injury, or assault." NDCC § 14–07.1–01(2). In finding that Robert's smashing a flower pot and ripping the phone from the wall were "not evidence of domestic violence sufficient to raise any presumption under the statute," I believe the trial court meant (*i.e.* implicitly found) that the two isolated outbursts were not domestic violence under the statute because they were not intended to inflict fear of imminent physical harm, or bodily injury or assault on Elizabeth, even though she testified they did so. Because the trial judge is the proper arbiter of credibility, I accede to that finding.

If Robert's two blow-ups were intended to inflict fear, etc., on Elizabeth, they would fulfill the statutory definition of domestic violence and trigger the presumption against Robert's receiving child custody, regardless of whether there was actual injury or physical abuse. Our statute is consonant with the expert view that domestic violence includes acts directed against property "when in fact the perpetrator is doing these behaviors to control or punish the adult victim." Anne Ganley, et al., "The Impact of Domestic Violence on the Defendant and the Victim in the Courtroom," *Domestic Violence: the Crucial Role of the Judge in Criminal Court Cases. A National Model for Judicial Education,* The Family Violence Prevention Fund, 1991. *Cf. State v. Gefroh,* 495 N.W.2d 651 (N.D. 1993) [damage to victim's property is evidence of intent to place victim in fear for her safety].

I cannot say that the trial court was clearly erroneous in finding that Robert's two isolated acts were not intended to create fear of imminent physical harm, bodily injury, or assault. The trial court heard the testimony and assessed the credibility of the witnesses. Although I may have done differently were I the fact finder, under NDRCivP 52(a), I am bound by the findings and based on this record, I cannot say that they are clearly erroneous.