# IN THE COURT OF APPEALS OF IOWA

———————

No. 25-0399
Filed January 28, 2026

———————

**In re the Marriage of Jeremy B. Young and Devin Marie Young**

Upon the Petition of
**Jeremy B. Young,**
Petitioner–Appellant/Cross-Appellee,

And Concerning
**Devin Marie Young,**
Respondent–Appellee/Cross-Appellant.

———————

Appeal from the Iowa District Court for Wapello County,
The Honorable Myron Gookin, Judge.

———————

**AFFIRMED**

———————

Diana L. Miller and Katelyn J. Kurt of Whitfield & Eddy, P.L.C., Mount Pleasant and Des Moines, attorneys for appellant.

Edward M. Conrad and Phoebe M. Cooper of Iowa Legal Aid, Ottumwa, attorneys for appellee.

———————

Considered without oral argument
by Ahlers, P.J., and Chicchelly and Sandy, JJ.
Opinion by Chicchelly, J.

1

**CHICCHELLY, Judge.**

Jeremy Young appeals and Devin Young cross-appeals the child-custody provisions of the decree dissolving their marriage. Jeremy seeks sole legal custody of their children while Devin requests joint physical care. Jeremy also contends that the visitation schedule, which allows Devin overnight visitation on weekdays during the school year, is contrary to the children's best interests. Because the child-custody provisions and the visitation schedule set out in the decree serve the children's best interests, we affirm.

## I. BACKGROUND FACTS AND PROCEEDINGS.

Jeremy and Devin married in 2014. They have four children between the ages of six and ten. They each obtained an order of protection against the other in November 2023. The protective orders directed them to follow a "rotating 3-2-2 visitation schedule,"[1] which provided equal parenting time.

In December 2023, Jeremy petitioned to dissolve the marriage. The main issue at the October 2024 trial was child custody, with each party requesting sole legal custody and physical care. They agreed that alternating physical care of the children on a weekly basis was preferrable to the 3-2-2 schedule they had been following. So as an alternative, Jeremy asked the court to grant joint physical care alternating weekly.

---

[1] Under this schedule, Party A has physical care of the children for three days. Physical care then transferred to Party B for two days before transferring back to Party A for two days. The schedule then repeats with Party B having physical care for three days.

The district court entered the decree dissolving the marriage in December 2024. In the fact findings, the court described the parties' "tumultuous" relationship:

> Jeremy admits that both parties know how to "push each other's buttons." Both have been physically aggressive toward each other and Devin admits they "didn't know when to stop" their aggressive behavior. She also admits she is stubborn and never wanted Jeremy to walk away from an argument thinking he won. Devin's mom . . . describes the relationship between Jeremy and Devin as "toxic."

The court found that Jeremy and Devin "have been mutually aggressive with each other," noting that both "have been charged criminally with assaulting the other," have obtained protective orders against each other, and have been charged with violating those protective orders. But it also found that "this chaos has somewhat subsided since the parties separated," "the children are healthy and doing as well as expected under the circumstances," and the parties "both love their children and the children love them."

The district court granted joint legal custody of the children and placed them in Jeremy's physical care. The court granted Devin visitation on alternating weekends during the school year, beginning at the end of the school day on Thursday and ending at the start of the school day on Monday. It also granted Devin more visitation during summer break with the goal of splitting physical caretaking equally "as near as reasonably possible." To effectuate this, the court ordered the parties to alternate physical care in two-week blocks.

## II. SCOPE OF REVIEW.

We review the child custody and visitation provisions of the parties' dissolution decree de novo. *See In re Marriage of Wang & Ye*, 26

3

N.W.3d 145, 149 (Iowa Ct. App. 2025).  On de novo review, we look at "the entire record and decide anew the issues properly presented."  *See In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005).  Although we give weight to the trial court's findings, they are not binding.  *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018).

## III. CHILD CUSTODY.

When the district court dissolves a marriage, it must settle disputes over legal custody and physical care of minor children.  *In re Marriage of Hynick*, 727 N.W.2d 575, 578–79 (Iowa 2007).  On appeal, Jeremy challenges the court's determination of the children's legal custody, which involves the right and responsibility to make decisions about their "legal status, medical care, education, extracurricular activities, and religious instruction."  *Id.* at 579 (quoting Iowa Code § 598.1(3), (5) (2023)).  Devin challenges the determination of physical care, which involves the right and responsibility to maintain a home and provide routine care for the children.  *Id.* (citing Iowa Code § 598.1(7)).  We address each argument in turn.

### A. Legal Custody.

We begin with legal custody.  The court granted the parties joint legal custody, meaning that "both parents have legal custodial rights and responsibilities toward the child and under which neither parent has legal custodial rights superior to those of the other parent." Iowa Code § 598.1(3).  Jeremy contends he should be granted the sole right to make custodial decisions.

To the extent it is reasonable and serves the children's best interests, the court should grant custody in a manner that provides the children maximum continuing physical and emotional contact with the parents and

encourages the parents to share custodial rights and responsibilities. *Id.* § 598.41(1)(a). But there is an exception to this general rule if contact with one parent is likely to cause "direct physical harm or significant emotional harm" either to the children or a parent. *Id.* Thus, section 598.41 exempts parents who are victims of domestic abuse perpetrated by the other parent from consequences that would otherwise flow from certain acts undertaken for protection. *Id.* § 598.41(1)(c) (stating that the court may find that a parent who has been the victim of domestic abuse has just cause to deny the children the opportunity for maximum contact with the other parent), (d) (stating that the court shall not consider a parent's relocation or absence from the home as a factor against that parent in awarding custody if there is a history of domestic abuse and the parent fears acts or threats of domestic abuse perpetrated by the other parent). It also provides a rebuttable presumption against awarding joint legal custody if the court finds there is a history of domestic abuse. *Id.* § 598.41(1)(b).

Iowa Code section 598.41(3) outlines the criteria for deciding legal custody.[2] The factors include each parent's suitability as legal custodian, the children's psychological and emotional needs and development, the parents' communication, and their ability to support the other parent's relationship with the children. *See* Iowa Code § 598.41(3)(a)–(c), (e). The court must also consider whether one or both parents are opposed to joint legal custody, the safety of the children and the other parent, and the existence of a history of domestic abuse. *Id.* § 598.41(3) (g), (i)–(j).

---

[2] If the parents agree to joint legal custody, the court need not consider the factors in section 498.41(3). Iowa Code § 598.41(4).

## 1. Whether the court was authorized to grant joint legal custody.

Jeremy first contends that the court lacked authority to award joint legal custody because both parents requested sole legal custody. He cites Iowa Code section 598.41(2)(a), which states, "On the application of either parent, the court shall consider granting joint custody in cases where the parents do not agree to joint custody." In Jeremy's view, the statute requires at least one parent to request joint legal custody before the court can grant it. In support of his argument, he cites an unpublished opinion interpreting the physical-care provisions of Iowa Code section 598.41 to require that at least one parent request joint physical care before the court can award it. *See In re Marriage of Cerwick*, No. 12-1188, 2013 WL 2370722, at *3 (Iowa Ct. App. May 30, 2013) (interpreting Iowa Code section 598.41(5)(a), which allows the court to award joint physical care "upon the request of either parent," and noting that "[t]he legislature could have provided that the district court may consider joint physical care whenever the best interest of the children so required—rather than upon the request of either parent").

The interpretation of section 598.41(5)(a) set out in *Cerwick* cannot be applied to section 598.41(2) based solely on the use of a similar phrase. We start with the history of section 598.41(2), which provides important context. The language that now appears in section 598.41(2)(a) was added in 1982,[3] when the legislature amended the law to provide explicit guidelines for granting joint legal custody. *See In re Marriage of Weidner*, 338 N.W.2d 351, 355 (Iowa 1983) (discussing the history of section 598.41, which originally stated only that "[t]he court may provide for joint custody of the

---

[3] In contrast, legislative amendments addressing joint physical care appeared first in 1997 and again in 2004. *See In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007) (discussing the legislative history of what is now section 598.41(5)).

children by the parties"). The supreme court found it "instructive" that the legislature added language encouraging joint legal custody a few months after a published decision denied joint custody based on one parent's objection. *Id.* at 356 (citing *In re Marriage of Castle*, 312 N.W.2d 147, 150 (Iowa Ct. App. 1981)). Although the supreme court found there is no presumption in favor of joint legal custody, it held the statute showed a clear preference for joint legal custody.[4] *Weidner*, 338 N.W.2d at 356. It also found that the amended statute "do[es] not allow one-party vetoes" to a grant of joint legal custody. *Id.* From this context, the phrase "[o]n the application of either parent" is less a prerequisite for granting joint legal custody than a signal that parental agreement is not needed. We also note that if one parent requests joint legal custody and the court rejects it, the court must cite clear and convincing evidence supporting its finding that it is unreasonable and not in the children's best interests.[5] Iowa Code § 598.41(2)(b). In other words, "A parent seeking sole legal custody must provide clear and convincing evidence that joint legal custody is unreasonable and not in the child's best interest, to the extent that the legal relationship between the other parent and child should be severed." *In re Marriage of Hammermeister*, No. 25-0354, 2025 WL 3471124, at *4 (Iowa Ct. App. Dec. 3, 2025).

In any case, a request was made for joint physical care. Although Jeremy primarily sought physical care of the children, his petition and request for relief include alternative requests for joint physical care with

---

[4] Section 598.41(5) includes no such preference in favor of joint physical care. *Hansen*, 733 N.W.2d at 692.

[5] There is no similar requirement that the court cite clear and convincing evidence when denying a request for joint physical care, *Hansen*, 733 N.W.2d at 692, further distinguishing determinations of joint legal custody under section 598.41(2)(a) from determinations of joint physical care under section 598.41(5)(a).

weekly exchanges. The court can only grant joint physical care if joint legal custody is awarded. Iowa Code § 598.41(5)(a). To reconcile this conflict, we interpret Jeremy's alternative request to include a request for joint legal custody. The court was thus able to consider granting joint legal custody.

**2. Whether the factors in section 598.41(3) support joint legal custody.**

Jeremy also argues that he should be granted sole legal custody based on evidence of domestic abuse. *See* Iowa Code § 598.41(3)(j). An unrebutted finding of a history of domestic abuse "shall outweigh consideration of any other factor specified in subsection 3 in the determination of the awarding of custody under this subsection." *Id*. § 598.41(2)(c).

> In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3, the issuance of a protective order against the parent or the issuance of a court order or consent agreement pursuant to section 236.5, the issuance of an emergency order pursuant to section 236.6, the holding of a parent in contempt pursuant to section 664A.7, the response of a peace officer to the scene of alleged domestic abuse or the arrest of a parent following response to a report of alleged domestic abuse, or a conviction for domestic abuse assault pursuant to section 708.2A.

*Id*. § 598.41(3)(j).

The district court found a history of domestic abuse exists but was rebutted by Jeremy's and Devin's "mutual aggression." *See In re Marriage of Barry*, 588 N.W.2d 711, 713 (Iowa Ct. App. 1998) (stating that section 598.41(2)(c)'s intended purpose is "to protect victims from their aggressors," so it should not be used by either party to gain an advantage at trial when the parents "are mutually aggressive, both verbally and physically"). The court noted that "the record supports, and both parties

admit, they are very proficient at pushing each other's 'buttons' and they do not know how or when to stop their violent behavior toward each other." Although the court denounced their "past negative, abusive behavior toward each other," it found they "share[d] the blame in much, if not all" of it, which rebutted the presumption against joint legal custody. The record shows that regardless of how events unfolded, Devin is the one who sustained significant physical injuries from their conflict.[6] The district court also found that the discord between the parties has subsided "somewhat" since their separation. We agree that any presumption against joint legal custody is rebutted.

Jeremy also argues that joint legal custody is inappropriate because the parties cannot communicate. *See* Iowa Code § 598.41(3)(c). But Jeremy's testimony conflicts with his claim on appeal.

---

[6] A photographic exhibit depicts some of Devin's injuries. One photo shows extensive bruising around Devin's left eye, bruising below her right eye, subconjunctival hemorrhaging in her left eye, and a cut above her left eyebrow. The photo was taken nine or ten days after Devin sustained the injuries during an argument that began at Jeremy's workplace. Jeremy and Devin both testified that Devin followed as Jeremy entered a secured area and Jeremy smashed both of their cell phones. According to Devin, Jeremy broke the phones to prevent her from calling the police and "bashed" her with a phone receiver when she tried to use a landline. Jeremy claims that while Devin was using the landline, he left and called building security from another phone. He testified that Devin was uninjured when he left the area and had blood running down her face when he saw her next, implying that she injured herself to incriminate him. Although the police investigated the incident, no criminal charges were filed. Jeremy testified that he was suspended from work while his employer investigated the incident and he was later terminated, in part, as a result.

Another injury occurred when Jeremy pushed or shoved past her while she tried to block the bedroom door to keep him from leaving. Although Jeremy testified that he did not put his hands on Devin, he struck her with enough force that she fell backward and hit her head on the corner of a wall. A photo of the injury shows twelve staples closing a bloody wound to her scalp.

9

Q. Do you have concerns if the Court keeps the joint physical care arrangement in place about you and Devin's ability to communicate effectively about the children? A. No.

Q. Do you think you would be able to communicate effectively? A. Yeah.

. . . .

Q. Do you understand or even recognize that even if you're granted primary physical care, that that's a decision that you and Devin would need to make together? A. Correct.

Q. Are you committed to communicating with her effectively in order to make that decision? A. Correct.

Because the record supports the finding that joint legal custody is reasonable and serves the children's best interests, we affirm.

## B. Physical Care.

Devin challenges the court's determination of physical care. She contends that joint physical care serves the children's best interests. Joint physical care is

> an award of physical care of a minor child to both joint legal custodial parents under which both parents have rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent.

*Id.* § 598.1(4).

Our overriding consideration in deciding whether to grant joint physical care is the children's best interests. *See Hansen*, 733 N.W.2d at 695. The goal "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* In

making this determination, we consider the factors listed in Iowa Code section 598.41(3). *Id.* at 696. We consider whether one parent was the primary caregiver, the parents' ability to communicate and show mutual respect, the degree of conflict between them, and the degree to which they are in general agreement about their approach to daily matters. *Id.* at 696–99. We look at the unique facts and circumstances of the case in deciding which physical-care arrangement serves the children's best interests. *Id.* at 700.

Devin argues that joint physical care serves the children's best interests because it allows both parents maximum involvement in the children's lives. She claims that Jeremy does not support the children's relationship with her family as much as she supports their relationship with Jeremy's family. Devin also argues that their issues with communication are attributable to Jeremy, who benefited from them when the court granted him physical care. Finally, she claims that despite the marital discord, the children are doing well and were not harmed by the joint-physical-care arrangement the parties followed during the proceedings.

The court weighed the pertinent factors and found joint physical care is not in the children's best interests. As a positive, the court noted that both Jeremy and Devin "have provided considerable caretaking duties for the children and have tried to balance work and home duties in the best interests of the children." But the court was concerned about the "high degree of historical conflict" in the parties' relationship, noting that they both "have failed in communicating and showing mutual respect for one another" and "struggled with demonstrating agreement on daily child rearing issues." It also found that the parties lived far enough apart that weekly custody exchanges would be "taxing" for four children age ten and younger.

The court found the children's best interests are served by placing the children in Jeremy's physical care. The court noted the decision was "a close one." The deciding factors included Devin's "significant past theft issues," which have resulted in criminal charges and two stores banning her from their premises. The record shows that she exposed the children to some of these acts, leading to one of the children viewing stealing as an acceptable alternative to buying when funds are insufficient. The court was also concerned about Devin's physical discipline of the children, which included spanking in addition to hitting or "popping" the oldest in the mouth for "being defiant and not listening."[7] We share these concerns and agree that they "tip the scales in Jeremy's favor." Because the children's best interests are served by placing them in Jeremy's physical care, we affirm.

## IV. VISITATION.

Finally, Jeremy challenges the visitation schedule the court entered, which provides Devin visitation on alternating weekends during the school year and alternating two-week blocks during the summer. The order states that Devin's weekend visits during the school year begin after school on Thursday and end when school begins on Monday. Jeremy claims that Devin is the cause of the children's frequent school absences and asks us to change the visitation schedule to begin after school on Friday and end on Sunday evenings, eliminating the need for Devin to take the children to school.

When the court grants physical care to one parent, it should provide liberal visitation to the other parent to "assure the child the opportunity for

---

[7] Devin testified that her primary form of discipline involved time out. She administers spankings to the younger children when they are defiant because they are small enough to do so. She testified that the oldest child is too big to spank so she pops her in the mouth, but she insisted she does not try to inflict pain by doing so.

the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). The visitation schedule must serve the best interests of the children. *In re Marriage of Gensley*, 777 N.W.2d 705, 718 (Iowa Ct. App. 2009).

There is insufficient evidence in the record to support Jeremy's claim that Devin has caused frequent absences from school. The district court noted that the children have been doing well overall. While one child has had some school tardies and unexcused absences, the evidence does not show that one parent bears more responsibility for them than the other.[8]

At the time of dissolution, the children were attending school in Ottumwa. The parties agreed that they should continue their schooling in Ottumwa. At the time the court entered the decree, Devin lived in Ottumwa while Jeremy lived thirty minutes away in Albia. Starting visits on Thursday afternoon and continuing them until Monday gives the children more contact with Devin, but it also reduces the children's school commute by one and one-half hours. We find the visitation schedule set out in the decree serves their best interests.

**AFFIRMED.**

Ahlers, P. J. concurs; Sandy, J., specially concurs.

---

[8] Because the record before the court at the time of dissolution does not show Devin has caused excessive absences or tardies, future evidence of this problem may form a substantial change in circumstances that calls for modifying the visitation schedule.

**SANDY, Judge** (specially concurring).

I agree with the majority that any presumption against joint legal custody is rebutted, but not because of "mutual aggression." Degree matters. *See Krank v. Krank*, 529 N.W.2d 844, 850 (N.D. 1995) (concluding that, where evidence shows domestic violence was committed by both parents, the trial court must measure the amount and extent of domestic violence inflicted by each, and if the violence inflicted by each parent is not "roughly proportional," the statutory presumption would apply).

Although the district court characterized the parties' conduct as "mutual aggression," the record does not reflect equivalent degrees of violence. Rather, the evidence reflects a marked disparity between Jeremy's and Devin's respective conduct and consequences. The record shows that Jeremy repeatedly inflicted physical violence (e.g., bashing Devin's face with the receiver of a landline phone and then claiming Devin inflicted the injury herself) resulting in significant bodily injury to Devin. Footnote six in the majority opinion does a nice job of describing—in detail—the injuries Devin sustained. But it still falls short of capturing the shock one experiences when viewing Devin's bloodied eye and severely bruised face.

However, the rebuttal against joint legal custody is supported by other best-interest considerations independent of the parties' physical conflict. The record establishes concerns regarding Devin's judgment and stability, including her theft-related acts, exposure of the children to those acts, and the use of inappropriate physical discipline against the children. These factors bear directly on the children's safety, development, and welfare and properly informed the court's custody analysis in rebutting the presumption. I give great deference to the district court on these factors because it had a front-row seat to the live testimony, viewing the demeanor of both Jeremy

14

and Devin as they testified, whereas we are limited to a sterile transcript. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). But pictures do not lie.

Equating domestic abuse without regard to the comparative severity under the auspices of "mutual aggression" is—in my opinion—a great danger. It is not merely "a wash" when one side escalated the violence far beyond the other. Not all domestic abuse is the same. I write separately to highlight that the majority opinion should not be interpreted as suggesting otherwise.