1999 ND 105

**April Jeanne HOLTZ, Plaintiff and Appellant,**

v.

**James Floyd HOLTZ, Defendant and Appellee.**

No. 980261.

Supreme Court of North Dakota.

June 18, 1999.

Paul C. Murphy (argued) and Marina Spahr (appearance), Murphy & Spahr Law Office, PC, Carrington, for plaintiff and appellant.

Neil Thompson, Thompson & Thompson, Devils Lake, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] April Jeanne Holtz appealed from a judgment changing the custody of her daughter, Jessica, to the child's father, James Floyd Holtz. We conclude the trial court's findings there was a material change of circumstances since the parties' divorce which required, in the best interests of Jessica, a change of custody, and James rebutted the presumption against

custody arising from past acts of domestic violence, are not clearly erroneous. We affirm.

I

[¶ 2] April and James married in 1988 at Reno, Nevada. Jessica was born November 12, 1990. The parties lived in California and Texas during their somewhat tumultuous and abusive marriage. When the parties separated in the fall of 1993, April and Jessica moved to Harvey, North Dakota, where April's mother lived. The couple was divorced by a North Dakota court in July 1994. James was served with the divorce papers while living in California, but made no appearance, claiming he could not afford to travel to North Dakota to contest the divorce. The court awarded April "sole and exclusive custody" of Jessica and reserved ruling on James's visitation rights until James applied to the court for visitation privileges. James was also ordered to pay child support.

[¶ 3] April, age 29 at the time of trial, is a high school graduate, but has a learning disability, is developmentally disabled, and was described as having below normal intelligence. A parent aide from Wells County Social Services spends about three or four hours per week with April to help her keep her two-bedroom apartment in Harvey in an orderly condition. April is not employed, but receives Supplemental Security Income payments for her disability, Aid to Families with Dependent Children payments, food stamps, medical assistance and rent subsidy payments. Jessica is a first grade student.

[¶ 4] James, age 31 at the time of trial, was described as being of average intelligence. He has been employed as an over-the-road trucker, but at the time of trial was working as a cab driver in Fresno, California. He has lived for two years in a three-bedroom apartment in Fresno with a married couple and their two minor children. James has had very little contact with Jessica since the divorce. He occasionally contacted the Wells County Social Services office expressing his desire to relinquish his parental rights because he was frustrated over continually being denied contact with the child. James's only visitation with Jessica occurred at the Social Services office. James, however, sent numerous letters to Jessica through the Social Services office because he was concerned Jessica would not see them if he sent them to her home address.

[¶ 5] In April 1997, James made a motion to establish a visitation schedule, or in the alternative, to change custody of Jessica. James alleged April had previously frustrated his attempts at visitation with Jessica, and April "is not mentally capable of growing with the child so she could be far enough ahead of the child to be able to handle the child's mental needs as far as growing up and progressing without substantial assistance."

[¶ 6] A court-appointed guardian ad litem (GAL) evaluated the situation and recommended that custody of Jessica be changed from April to James. The GAL reported she did not find April "credible" during their conversations, that April relied on Jessica to assist her in dealing with unknown persons and unfamiliar circumstances, and that "Jessica frequently speaks up for her mother and explains things to her." Noting April's "ineffectiveness in parenting," the GAL said she could not "condone leaving a seven year old child in a home to care for her developmentally disabled mother." The GAL also noted James's "unique living arrangements," but said she was "convinced that if James[ ] were awarded custody of Jessica that she would be warmly absorbed into this less than conventional family unit." The GAL recommended a schedule for transfer of custody, that April be awarded reasonable visitation and be required to pay child support, that James be required to enroll in and complete parenting and anger management classes, that April be encouraged to continue to work on her parenting skills, and that James have Jessica evaluated for possible learning disabilities.

[¶ 7] Both parties, the GAL, and several other persons testified at the hearing. However, April either refused to respond to, or gave inaudible responses to, the vast majority of the questions posed to her by the court and the attorneys. The trial court found "a material change in circumstances based upon [April's] mental incapacity to develop as . . . Jessica . . . grows older and develops in her own right. Therefore, [April] would not be capable or competent to raise the minor child. . . ." The court also found the best interests of Jessica would be served by changing custody to James. April appealed.

## II

[¶ 8] April contends the trial court erred in granting James's motion for change of custody.

[¶ 9] For cases decided after August 1, 1997, motions to modify custody are governed by statute. *See Hill v. Weber,* 1999 ND 74, ¶ 9, 592 N.W.2d 585. N.D.C.C. § 14-09-06.6 provides in pertinent part:

6. The court may modify a prior custody order after the two-year period following the date of entry of an order establishing custody if the court finds:

a. On the basis of facts that have arisen since the prior order or which were unknown to the court at the time of the prior order, a material change has occurred in the circumstances of the child or the parties; and

b. The modification is necessary to serve the best interest of the child.

. . . .

8. Upon a motion to modify custody under this section, the burden of proof is on the moving party.

[¶ 10] This part of the statutory formulation essentially tracks the two-step approach previously used by this Court for deciding a change of custody case. While the best interests and welfare of the child are the sole concerns in an original custo-

dial placement, *e.g., Dinius v. Dinius,* 1997 ND 115, ¶ 11, 564 N.W.2d 300, to modify child custody a court must consider whether there is a significant change of circumstances since the original custody decree, and if so, whether this change compels or requires the court to change custody to serve the best interests of the child. *E.g., State ex rel. Melling v. Ness,* 1999 ND 73, ¶ 27, 592 N.W.2d 565. A district court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review under N.D.R.Civ.P. 52(a). *Gietzen v. Gietzen,* 1998 ND 70, ¶ 8, 575 N.W.2d 924. A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, upon review of the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Sumra v. Sumra,* 1997 ND 62, ¶ 8, 561 N.W.2d 290.

## A

[¶ 11] The trial court found a "material change in circumstances based upon [April's] mental incapacity to develop as . . . Jessica . . . grows older and develops in her own right." We conclude the trial court's finding of a material change in circumstances is not clearly erroneous.

[¶ 12] Although there is no expert medical evidence in the record establishing the parameters of April's developmental disability at the time of the divorce or at the time of the custody hearing, there is abundant evidence showing that April was simply no longer able to effectively care for Jessica because of April's mental limitations. April has dyslexia, a learning disability, a low IQ, and is developmentally disabled. April's parent aide helps her "with many of the basic tasks that she needs to do from day to day." The parent aide helps with home management, writes most of April's checks, helps her balance the checkbook, and informs her "about the developmental stages of children at certain levels and what behaviors are normal." April's parent aide had worked with April

for more than three years and testified that, without the assistance given to April, she and Jessica could not function as a family unit because April is not mentally capable of doing things by herself.

[¶ 13] The parent aide testified April is very withdrawn and needs help with socializing, but has refused to go to group therapy sessions to try and remedy the situation. When Jessica interacts with her mother, according to the parent aide, Jessica acts "childish" and "whiny," a lower level of maturity she exhibits while interacting with other children as well. Jessica is also hyperactive at school, and because of her immaturity and extreme difficulty with some subjects, the school planned to have her repeat the first grade. The parent aide also testified she sometimes worries about Jessica eventually having to take care of April. When the GAL asked a social worker how long the parent aide would be available to assist April, "he stated that a decision had not been made on when to terminate the assistance but that the 'team' had commented that at some point the child would start to take care of the mother and they could then pull the parent aide out of the home at that time."

[¶ 14] The GAL testified she found "[v]ery little" credibility with April, and believed April gave answers April thought she wanted to hear. The GAL was also concerned Jessica may have a learning disability. The GAL discussed her concerns with April, but April said Jessica did well in school and did not think there was a problem. Administrators at Jessica's school informed the GAL they also thought Jessica may have a learning disability, and the GAL made an appointment to have Jessica evaluated by a Minot psychiatrist. April refused to sign a medical release so the GAL and the school could get copies of the evaluation. The GAL explained in her report:

> It took several minutes to convince her to sign and when she did she appeared to be traumatized by my request. She was visibly shaking and seemed to be

having trouble breathing. She finally admitted that the reason she was reluctant to sign was that she thought the court would use it against her. I asked how she expected the school to help Jessica if she did have [learning disabilities] and they had no information about it. She was unable to answer other than to say that she didn't want the court to see the report. She had little understanding of [learning disabilities] and seemed to want to discuss her own disability.

[¶ 15] When a Social Services volunteer drove April and Jessica to the psychiatrist, she reported that April was unable to control Jessica, who would not stay in the car seat. The visit with the psychiatrist was cut short because "Jessica became so demanding and out of control." April refused to take Jessica back to the psychiatrist to complete the testing, explaining she and Jessica were moving to California soon. April also told the GAL she would not be willing to take Jessica to see a counselor, even if a court ordered her to do so, because "Jessica doesn't need it." Jessica's teacher stopped sending homework home with the child because April was unable to help her with the work, and on the few occasions she attempted to assist, the answers were often wrong. Jessica knew the homework answers were wrong but explained to her teacher that April was simply unable to help her.

[¶ 16] A social worker told the GAL teaching April more parenting skills was not an available option because April cannot work in a group atmosphere and any assistance must be given on a one-to-one basis. Even on that basis, skills taught to April by the parent aide "are not retained well and she quickly falls back to her less effective methods of discipline." The GAL said:

> Given the resources currently available and April's inability and/or unwillingness to learn parenting skills, I see no reason to believe that she will ever be able to parent Jessica on a full time basis. Jes-

sica would appear to be "out growing" her mother's limited parenting skills and the problem is likely to get worse as time passes. I observed a number of situations in which Jessica used inappropriate behavior to manipulate April including whining, screaming and hitting and kicking her mother.

[¶ 17] A material change of circumstances can occur if a child's present environment may endanger the child's physical or emotional health or impair the child's emotional development. *See Hill,* 1999 ND 74, ¶ 11, 592 N.W.2d 585; N.D.C.C. § 14–09–06.6(3)(b). Although April's mental abilities apparently have not worsened since the original custodial placement, Jessica's needs have changed and will continue to change as she grows older and matures. We have said changed circumstances required in a modification proceeding must be new facts which were unknown to the moving party at the time the decree was entered. *See, e.g., Frafjord v. Ell,* 1997 ND 16, ¶ 7, 558 N.W.2d 848; *Leppert v. Leppert,* 519 N.W.2d 287, 292 (N.D.1994). However, even if the trial court in this case knew at the time the divorce decree was entered that Jessica's needs would change as she grew older, we do not believe the trial court was foreclosed from finding a material change of circumstances. Where the present environment endangers the child's physical or emotional health or impairs the child's emotional development, there is as a matter of law a material change of circumstances that warrants a change of custody under N.D.C.C. § 14–09–06.6(6). *See Hill,* 1999 ND 74, ¶ 11, 592 N.W.2d 585. We conclude April's inability to mentally cope with and parent her growing child constitutes a material change of circumstances, and the trial court's finding to that effect is not clearly erroneous.

## B

[¶ 18] The trial court did not expressly state this material change of circumstances "requires" or "compels" chang-ing custody of Jessica from April to James. Instead, the trial court's findings focus on the general best interests factors appropriate for an original custodial placement. *See Dinius,* 1997 ND 115, ¶ 11, 564 N.W.2d 300. April, however, has not raised this as an issue on appeal. In any event, we do not remand for clarification of findings of fact when, through inference or deduction, we can discern the rationale for the result reached by the trial court. *Almont Lumber & Equipment Co. v. Dirk,* 1998 ND 187, ¶ 13, 585 N.W.2d 798. We will rely on implied findings of fact when the record enables us to clearly understand the district court's factual determinations, and the basis for its conclusions of law and judgment. *Schmitz v. Schmitz,* 1998 ND 203, ¶ 6, 586 N.W.2d 490. Here, the trial court found April "would not be capable or competent to raise" Jessica, thereby implying that a change of custody was not only in Jessica's best interests, but was required by the material change of circumstances. *See Hill,* 1999 ND 74, ¶ 11, 592 N.W.2d 585; *Carver v. Miller,* 1998 ND App 12, ¶ 16, 585 N.W.2d 139. We further conclude that this implied finding is abundantly supported by the record.

[¶ 19] April contends the trial court failed to give proper weight to the fact April had custody of Jessica for the past five years and that the stability of leaving Jessica in her current environment outweighs any benefits from a change of custody.

[¶ 20] We have said maintaining stability and continuity in the child's life, without harm to the child, is the most compelling factor when considering a motion for change of custody. *See Alvarez v. Carlson,* 524 N.W.2d 584, 589 (N.D.1994). Requiring a showing a change of custody is compelled or required gives some finality to a trial court's original custody decision and helps ensure that a child is not bounced back and forth between parents as the scales settle slightly toward one parent and then the other. *See Lovin v. Lovin,* 1997 ND 55, ¶ 17, 561 N.W.2d 612.

Thus, when a court decides a change of custody is compelled or required, the court has effectively determined the stability that may have existed with the custodial parent has been outweighed by benefits from the change of custody.

[¶ 21] Here, the trial court ·essentially found the present circumstances in April's custodial home were not beneficially stable, but were potentially harmful to Jessica. The court found:

> [April] is not mentally capable to guide [Jessica] and to continue to assist the child with educational needs. [April] does not accept advice pertaining to raising the minor child and refuses to do the things that are necessary to help further the child's education and guide the minor child.
>
> . . . .
>
> [Jessica] is developing at home and at school, but she needs more assistance in view of the fact that it is reported that she is not maturing at an adequate level so she will be repeating first grade in school.

The trial court found Jessica's immaturity was attributable to April's inadequate parenting capabilities and "the conditions in her present residence." These findings are supported by the record.

[¶ 22] After April and Jessica moved to Harvey, Social Services began receiving child neglect complaints relating to lack of supervision and emotional abuse by April by her yelling at Jessica. Social Services arranged to have Jessica enrolled in a preschool and child care center, and later involved the child in the Headstart program. Social Services also had conferences with April regarding her "rather harsh discipline techniques," including one incident when April was confronted "about letting her boyfriend ... spank Jessica with a belt." Social Services also received a letter from Headstart regarding "April's hygiene, outbursts, refusal to participate in the program's parent group, [and] yelling at Jessica." One of the last entries on the case by Social Services says "Jessica was absolutely out of control. April could not manage her." This evidence illustrates the decline in April's ability to care for Jessica, as well as the lack of any real stability in Jessica's life as the years have progressed.

[¶ 23] On the other hand, despite what the GAL termed James's "less than conventional family unit," the trial court found James is capable of providing the necessary maintenance, love, affection and guidance for Jessica and is capable of assisting her with her education. The GAL spoke extensively with James and the woman who resides in the Fresno apartment. According to the GAL, all three adults in the apartment have jobs. The married couple have one of the bedrooms and the two children have their own bedrooms. James sleeps on the couch and Jessica would sleep in one of the girl's rooms in her own bed. James testified he is also attempting to find his own home. The woman living there was supportive of James's efforts to obtain custody of Jessica, and James said he would place Jessica in daycare with a longtime friend, a licensed foster care provider in California. James also expressed his willingness to have Jessica see a counselor "to help her adjust" and to have her evaluated for possible learning disabilities. James also said he "would help Jessica overcome any problems she might have."

[¶ 24] Although April complains about the lack of contact James has had with Jessica over the last five years, the record suggests the difficulty James has had trying to maintain contact with Jessica is mainly attributable to April. While there was no court order setting a visitation schedule for James, visitation with a non-custodial parent is presumed to be in a child's best interests, *see Reinecke v. Griffeth*, 533 N.W.2d 695, 698 (N.D.1995), and divorced parties are not foreclosed from fostering additional visitation to that decreed by the trial court. *See Novak v. Novak*, 441 N.W.2d 656, 658 (N.D.1989). April cannot credibly contend she was en-

titled to thwart James's attempts to contact Jessica simply because the court had not set forth a formal visitation schedule. The GAL and the trial court noted Jessica's excitement when talking to James by telephone. James's letters to Jessica, according to the GAL, were age and content appropriate, expressed his love for Jessica, and often included a phone number where she could reach him by calling collect. Although April served the role of Jessica's "primary caretaker," that designation has never gained a presumptive status in this state. *See Hogue v. Hogue*, 1998 ND 26, ¶ 14, 574 N.W.2d 579. Moreover, April's role as primary caretaker is hardly a beneficial attribute to her retaining custody when the change of circumstances is based on her growing inability to appropriately function in that role.

[¶ 25] We conclude the trial court's implied finding that the material change of circumstances required or compelled, in Jessica's best interests, the change of custody is not clearly erroneous.

## C

██ [¶ 26] April contends the trial court erred in failing to weigh James's incidents of domestic violence in arriving at its decision to change custody.

██ [¶ 27] In *Reeves v. Chepulis*, 1999 ND 63, ¶¶ 11–12, 591 N.W.2d 791, we recently explained the domestic violence presumption:

A trial court's evaluation of evidence of domestic violence in a custody determination is guided by subsection (j) of N.D.C.C. § 14–09–06.2(1). Section 14–09–06.2(1)(j) was amended in 1993 to create a rebuttable presumption against awarding custody to a parent who had perpetrated domestic violence when the court found "credible evidence that domestic violence has occurred." *See* 1993 N.D. Sess. Laws ch. 144, § 2. In 1997 the Legislature amended the statute again, raising the level of domestic violence required to trigger the presumption. *See* 1997 N.D. Sess. Laws ch. 147,

§ 2. The presumption is now triggered when the trial court finds: "credible evidence that domestic violence has occurred, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding." *Id.; see Dinius v. Dinius*, 1997 ND 115, ¶ 18, 564 N.W.2d 300 (discussing the effect of the 1997 amendment).

Once the presumption under section 14–09–06.2(1)(j) is triggered, the issue of domestic violence becomes the "paramount factor" in the trial court's custody decision. *Engh v. Jensen*, 547 N.W.2d 922, 924 (N.D.1996). The presumption prevents an abusive parent from obtaining custody of the child unless the abusive parent proves "by clear and convincing evidence that the best interests of the child require" the abusive parent to participate in or have custody. *Id.* (citing N.D.C.C. § 14–09–06.2(1)(j)); *see also Zuger v. Zuger*, 1997 ND 97, ¶ 31, 563 N.W.2d 804.

Evidence of domestic violence which is insufficient to trigger the presumption nevertheless remains one of the best-interest factors to be considered by the court under N.D.C.C. § 14–09–06.2. *See Reeves*, 1999 ND 63, ¶ 15, 591 N.W.2d 791; *Ramstad v. Biewer*, 1999 ND 23, ¶ 21, 589 N.W.2d 905; *Zimmerman v. Zimmerman*, 1997 ND 182, ¶ 7, 569 N.W.2d 277; *Huesers v. Huesers*, 1997 ND 33, ¶ 7, 560 N.W.2d 219.

██ "Domestic violence" is defined in N.D.C.C. § 14–07.1–01(2) as including:

physical harm, bodily injury, sexual activity compelled by physical force, assault, or the infliction of fear of imminent physical harm, bodily injury, sexual activity compelled by physical force, or assault, not committed in self-defense, on the complaining family or household members.

The domestic violence presumption is not confined to circumstances in which a parent or child is the direct victim of the violence, but includes "persons who are in a dating relationship," or "persons who are presently residing together or who have resided together in the past." *Anderson v. Hensrud*, 548 N.W.2d 410, 413 (N.D. 1996); N.D.C.C. § 14–07.1–01(4). When the original custody decree is entered upon default or based upon a stipulation of the parties, the trial court must consider all relevant evidence, including pre-divorce domestic violence, in deciding a change-of-custody issue. *See Wetch v. Wetch*, 539 N.W.2d 309, 312 (N.D.1995). *See also Kraft v. Kraft*, 554 N.W.2d 657, 659 (N.D. 1996). When a trial court addresses whether evidence of domestic violence triggers the presumption under N.D.C.C. § 14–09–06.2(1)(j), we require the court to make specific and detailed findings regarding the effect the allegations of domestic violence have on the presumption. *See Kasprowicz v. Kasprowicz*, 1998 ND 68, ¶ 13, 575 N.W.2d 921. Specific factual findings are not required when the evidence of domestic violence does not rise to the level triggering the presumption. *See Reeves*, 1999 ND 63, ¶¶ 13, 16, 591 N.W.2d 791.

■■■ [¶ 28] The trial court's written findings and conclusions on the domestic violence issue are brief. The court said "there has been abuse by both of the parties toward each other, but none recently," and noted James "has received treatment" since then. The trial court's oral findings, which can be considered by this Court if they do not conflict with the written findings, *see generally Fenske v. Fenske*, 542 N.W.2d 98, 102 (N.D.1996), further explained:

There is a history of domestic violence existing between the parties in which both parties participated but which [James] was more abusive towards [April].... These circumstances occurred before the birth of the child. There have been no recent circum-

stances of domestic violence. [James] has sought counseling and appears to exhibit proper anger management at the present time. The presumption of custody not being with the ... father, comes into play, but ... this presumption is overcome by the circumstances of the individuals, the previous findings that the Court just made on domestic violence, and the findings regarding the best interests of the child including, but not limited to, [April's] inadequate capability for parenting.

[¶ 29] April relies on James's harassment of her family, his hitting her during the marriage, a marital rape and a tire slashing incident after the marriage to show James should not be entitled to custody. James denied that the telephone calls he made to some of April's relatives were harassment. James denied raping April and rape charges were dropped in California when April admitted in a signed statement that she had lied about the incident. James admitted hitting April once during the marriage because she had hit Jessica. The only alleged incident of domestic violence to occur after James and April separated in 1993 was in 1995 when James brandished a knife and slashed his girlfriend's car tires he had bought for her after discovering her at home with another man. *Compare Ryan v. Flemming*, 533 N.W.2d 920, 923–24 (N.D.1995) (holding father's acts of breaking flower pot and pulling phone off the wall which produced no actual injury to household members were insufficient to raise domestic violence presumption).

[¶ 30] The trial court found there had been no recent incidents of domestic violence and James has been taking anger management classes and counseling. We agree the evidence of domestic violence is remote in time. More important, however, the trial court found any presumption against custody arising against James from the incidents of domestic violence was rebutted by the same factors that necessitated the change of custody.

**10**

[¶ 31] We believe April's mental inability to parent Jessica, coupled with James's legitimate attempts to receive professional help to control his anger, constitute clear and convincing evidence under N.D.C.C. § 14–09–06.2(1)(j) that the best interests of the child require James to have custody of Jessica. We conclude the evidence in this record supports the trial court's findings and conclusions that James has rebutted any presumption against custody of Jessica arising from his past incidents of domestic violence.

### III

[¶ 32] We have reviewed April's other claims of error and deem them to be without merit. The GAL did not apply an improper domestic violence standard under North Dakota law in evaluating the evidence of domestic violence. The trial court did not err in failing to place custody of Jessica with the fiancee of April's brother, rather than James, based on the record before the trial court. Having found the best interests of Jessica required a change of custody to James who lives in California, the trial court was not further required to find separately that a move to the state of California would be in Jessica's best interests.

[¶ 33] The judgment is affirmed.

[¶ 34] SANDSTROM, NEUMANN, MARING, and KAPSNER, JJ., concur.