2005 ND 92

**Thomas J. WOODS, Plaintiff
and Appellee,**

v.

**Jennifer RYAN, f/k/a Jennifer Woods,
Defendant and Appellant.**

No. 20040227.

Supreme Court of North Dakota.

May 17, 2005.

Rehearing Denied June 22, 2005.

Paul M. Probst (argued), Probst Law Firm, Minot, N.D., for plaintiff and appellee.

William E. Bergman (argued) and Charles G. DeMakis (on brief), Olson & Burns, P.C., Minot, N.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1]   Jennifer Ryan, formerly known as Jennifer Woods, appealed an amended judgment changing child custody in a divorce action brought by Thomas J. Woods. We affirm.

## I

[¶ 2]   In accordance with their stipulation, Woods, who was then 24, and Ryan, who was then 18, divorced in 2000. The judgment (1) granted Woods a divorce; (2) granted the parties joint legal custody of their child; (3) granted Ryan physical custody of the child and gave Woods liberal visitation; (4) ordered Woods to pay child support of $255 per month; (5) listed Ryan's address as 1105 5th Ave. NW in Minot; (6) indicated Ryan was unemployed; and (7) divided the parties' property and debts.

[¶ 3]   In 2003, Woods moved to amend the divorce judgment to grant him custody of the parties' child. Woods supported the motion with a brief and an affidavit asserting, among other things: (1) The parties' child "lives with his grandparents, David and Barbara Rust." Ryan "does not reside at this residence, and it is unknown where she resides;" (2) He can provide his son with a stable environment in his home; (3) Ryan "is not working, has no permanent address, and has been in jail on several occasions for various offenses, including drug related activities;" and (4) "I have the necessary skills, desires, and ability to care

for my child, and I feel it [is] in his best interests to be raised by me, as opposed to his grandparents."

[¶ 4] Ryan responded with an affidavit stating, among other things: (1) "Since the entry of Judgment of Divorce, she has lived and continues to live with her parents in Minot and has resided nowhere else, except for a one-month period in 2002;" (2) "There has been no significant change of circumstances since the divorce;" (3) "Allegations that she has turned over custody of her son to her parents and does not reside in her parent[ ]s['] home are completely groundless and false;" (4) Their child "has lived in a stable and satisfactory home environment with Jennifer and her parents;" (5) "While the allegations of [Woods'] affidavit that I have been in jail are correct, the offenses were for driving under suspension and without insurance, and one time only for possession of drug paraphernalia;" and (6) Woods "has not regularly exercised visitation." Ryan's mother filed an affidavit averring, among other things: (1) Ryan and the parties' child have lived with her and her husband since the time of the divorce, except for one month in 2002; (2) Ryan "has not turned over custody of [the child] to me and my husband, nor has she moved out of our home," and (3) Woods "has not regularly exercised visitation."

[¶ 5] The district court issued an order finding Woods "has established a prima facie case for custody modification." After a hearing, the court issued a memorandum and order. The court found a material change of circumstances:

Jennifer has been chronically unemployed since the August 2000 divorce. She has had spasms of employment in the period of August 2000 to January 16, 2004. The evidence was uncontested that Jennifer has been unwilling or unable to step up and help support [the child]. Her parents have supported her and [the child]. Child support does not begin to cover [the child's] needs. Sadly, Jennifer and her mother appear to be content for over three years for Jennifer to live off her parents. At trial, Jennifer was pregnant. Jennifer testified that she has a number of fines and that her mother pays her fines for her in return for some work she does around the house. Clearly, Jennifer needs to get a job so she can better support [the child], herself, and her new baby. Her three years of chronic unemployment is a material change of circumstance when other factors are taken into account.

Jennifer denied that she turned over care of [the child] to her parents.... While not finding Jennifer has turned complete care of [the child] over to anyone, the Court does find that Jennifer's parents and grandparents have no doubt [ ] had significant involvement with [the child] on a near day to day basis.

In further support of his position that there has been a change in circumstances, Tom pointed to Jennifer's arrests in 2003 ... the numerous convictions and time of arrest involved—even as to charges dismissed—do not support her position in regard to the overall material change of circumstances issues. This point is amplified by Jennifer's three years of chronic unemployment and the repetitive 2003 early morning arrests coming on [the] heels of the chronic unemployment and then her apparent secret marriage to Chris Ryan only to be followed a short time later by separation and her return to her parents' home.

Cumulatively, taking the above factors into account, this Court finds there has been a material change of circumstances. This conclusion is supported by Tom's actions since the August, 2000,

divorce which include his marriage to and the stable lifestyle they have established.

The trial court found that "a change in custody is necessary for the best interests of" the parties' child. An amended judgment was entered that granted Woods' motion to amend the judgment, fixed a visitation schedule, and fixed Ryan's child support obligation. Ryan appealed.

[¶ 6] The district court had jurisdiction under N.D. Const. art VI, § 8, and N.D.C.C. § 27–05–06. The appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

## II

[¶ 7] Ryan has raised the following issue on appeal: "Whether the District Court erred when it determined that Thomas J. Woods Sr. had proven a material change in circumstances that necessitated a change of custody for [the parties' child] from his mother, Jennifer Ryan f/n/a Jennifer Woods."

[¶ 8] The test for changing the custody of a child is set forth in N.D.C.C. § 14–09–06.6(6):

The court may modify a prior custody order after the two-year period following the date of entry of an order establishing custody if the court finds:

a. On the basis of facts that have arisen since the prior order or which were unknown to the court at the time of the prior order, a material change has occurred in the circumstances of the child or the parties; and

b. The modification is necessary to serve the best interest of the child.

[¶ 9] "A district court's decision whether to change custody is a finding of fact subject to the clearly erroneous stan-

dard of review." *Kelly v. Kelly*, 2002 ND 37, ¶ 13, 640 N.W.2d 38. Section 14–09–06.6(6), N.D.C.C., requires a court to use a two-part analysis in deciding whether or not to change custody of a child. First, the "court must consider whether there has been a material change of circumstances since the original custody decree." *Kelly*, at ¶ 15. "[I]f the court decides there has been a material change in circumstances, it must decide whether a change in custody is necessary to serve the best interests of the child." *Id.* A party seeking modification of an existing custody order bears the burden of proof. *Id.* at ¶ 17. " 'A trial court's findings of fact are presumptively correct, and we view the evidence in the light most favorable to the findings.' " *Reineke v. Reineke*, 2003 ND 167, ¶ 12, 670 N.W.2d 841 (quoting *Schmidt v. Schmidt*, 2003 ND 55, ¶ 5, 660 N.W.2d 196). "The burden is on the complaining party to demonstrate on appeal that a trial court's finding of fact is clearly erroneous." *Marschner v. Marschner*, 2002 ND 67, ¶ 4, 642 N.W.2d 857. "A trial court's opportunity to observe the witnesses and determine credibility should be given great deference." *Frieze v. Frieze*, 2005 ND 53, ¶ 8, 692 N.W.2d 912. "We give due regard to the trial court's opportunity to assess the credibility and observe the demeanor of witnesses, *see Wagner v. Wagner*, 2000 ND 132, ¶ 12, 612 N.W.2d 555, and we do not retry custody issues or reassess the credibility of witnesses if the court's decision is supported by evidence in the record." *Corbett v. Corbett*, 2001 ND 113, ¶ 6, 628 N.W.2d 312. "We will not reverse a trial court's factual findings merely because we may have viewed the evidence differently, and a choice between two permissible views of the weight of the evidence is not clearly erroneous." *Id.*

[¶ 10] Section 14–09–06.2(1), N.D.C.C., provides 13 factors for consideration in

determining the best interests and welfare of a child:

> For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:
>
> a. The love, affection, and other emotional ties existing between the parents and child.
>
> b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.
>
> c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
>
> d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.
>
> e. The permanence, as a family unit, of the existing or proposed custodial home.
>
> f. The moral fitness of the parents.
>
> g. The mental and physical health of the parents.
>
> h. The home, school, and community record of the child.
>
> i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
>
> j. Evidence of domestic violence. . . . .
>
> k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household

> of a parent and who may significantly affect the child's best interests. . . .
>
> l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.
>
> m. Any other factors considered by the court to be relevant to a particular child custody dispute.

[¶ 11] Improvements in the life of a noncustodial parent seeking to modify a child custody order "would not, by themselves, constitute a significant change in circumstances." *Kelly v. Kelly*, 2002 ND 37, ¶ 20, 640 N.W.2d 38. A parent's unemployment may be considered. *See Krank v. Krank*, 2003 ND 146, ¶ 10, 669 N.W.2d 105 (evidence supported the trial court's findings under N.D.C.C. § 14–09–06.2(1)(c) where "the court found that the evidence shows the child's father has a history of employment at good paying jobs and is a good provider while the mother is currently unemployed").

> "In a modification proceeding, the best interests of the child must be gauged against the backdrop of the stability of the child's relationship with the custodial parent." *Blotske [v. Leidholm]*, 487 N.W.2d [607,] 610 [(N.D.1992)]. "[I]f the previous custody placement was based upon the parties' stipulation and not by consideration of the evidence and court made findings, the trial court must consider all relevant evidence, including pre-divorce conduct and activities, in making a considered and appropriate custody decision in the best interests of the children." *Wetch v. Wetch*, 539 N.W.2d 309, 312–13 (N.D.1995).

*Kelly*, at ¶ 22. In this case, the previous custody placement was based on the parties' stipulation.

[¶ 12] Of the thirteen factors for consideration under N.D.C.C. § 14–09–06.2(1), the trial court found factors a, b, d, e, h, and m do not favor either party, while factors i, j, and l do not apply to this case. The court found that factors c, f, and g favor Woods, explaining:

> When compared to Jennifer and her dependence on her parents, Factor "c" favors Tom by his earnings from his employment. Tom's stable lifestyle shines under Factor "f" when compared to Jennifer's very hectic 2003 which saw her arrested a number of times-even late at night, her secret marriage and move out of her parents['] home only to separate from her spouse and move back home less than a month later. Factor "g" favors Tom since Jennifer has experienced some 3 years of chronic unemployment and in less than a 30–day period in 2003, she moved out of her parents['] house, became pregnant by her unemployed spouse, and found it necessary to move back home and thereby separated from her new spouse. Such a series of events certainly has to take a toll mentally on any sane and strong person. Such a toll was noted in Jennifer's demeanor at the January hearing.

The court found factor k favors Ryan:

> Jennifer is favored by Factor "k" through her parents['] and grandparents['] interaction with [the parties' child]. It is well established that a trial court, as a part of the best interest of the child, must take stability of said child's relationship with the custodial parent into account in a modification proceeding. *Id.* Testimony was received that Jennifer has a good relationship with [the child] and that she has been his only primary care giver. Yet, uncontested testimony was received that Jennifer would move out of her parents'

home once she is financially stable. Additionally, Tom has had a solid and close relationship with [the parties' child] except when Tom was [ ] on TDY or Jennifer was making what appear to be for the most part somewhat lame excuses to put off [the child's] visitation with his father. Thus, the stability factor in this case is greatly diminished.

[¶ 13] Ryan asserted in her brief that "[t]he trial court erred when it failed to take into consideration the impact that modifying custody would have on splitting [the parties' child] from his unborn sister." However, the court considered it under factor m:

> Factor "m" may be applicable to this case in regard to half-brother/sister [the child] has by way of Jennifer's most recent pregnancy. However, no evidence was provided as to such and such a factor could well cut against Jennifer due to her inability to provide the necessities for [the child]. In the end, the Court finds Factor "m" does not favor either party.

[¶ 14] Ryan testified, among other things: Child support is her only source of income; her mother gives her money for daily expenses; she moved out of her parents' house "[f]or a little under a month" when she and Chris Ryan got married, "but it didn't work out with living on our own so we moved back in;" she has been married a little over a year and her husband has been unemployed during that time; she is separated from her husband; she has three convictions for driving under suspension; she has been charged twice with driving without insurance and has been charged with exhibition driving; she was charged with criminal mischief at 1:15 a.m.; she pleaded guilty to a 1:53 a.m. drug paraphernalia charge, for which she received a fine, which her mother has been paying; she does not have a valid driver's

license; and the criminal mischief charge and a driving-under-suspension charge were dropped.

[¶ 15] Ryan's mother testified that she found out her "daughter was married ... [t]hrough the paper and then we asked her," and that Mr. Ryan has never lived in her home. Ryan's grandmother testified she visits the house where Ryan lives "four or five times a week," she does not know where the father of Ryan's unborn child lives and has met him only once, and she does not know where Ryan married.

[¶ 16] In light of the evidence of Ryan's continued unemployment and secret marriage, the trial court's assessment of her demeanor, and the evidence of Ryan's early morning arrests for criminal mischief and possession of drug paraphernalia and her numerous convictions and arrests for driving under suspension, driving without insurance, and exhibition driving, there is evidence supporting the trial court's findings that consideration of factors c, f, and g under N.D.C.C. § 14–09–06.2(1) favors Woods, which, when balanced against the court's finding that factor k favors Ryan, supports the court's finding that "a change in custody is necessary for the best interests of" the parties' child. We have not been left with a definite and firm conviction a mistake has been made. We conclude the trial court's finding is not clearly erroneous.

### III

[¶ 17] The amended judgment of the district court is affirmed.

[¶ 18] CAROL RONNING KAPSNER, J., concur.

[¶ 19] The Honorable WILLIAM A. NEUMANN, a member of the Court when this case was heard, resigned effective March 14, 2005, and did not participate in this decision.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 20] I concur in the result reached by the majority. I understand Justice Maring's concern that some of the rhetoric of the trial court leads one to conclude this matter was treated as an initial custody determination rather than one of modification of an existing custody order. As the majority opinion notes, we have held that where the initial custodial order was based upon the stipulation of the parties, rather than by consideration of the evidence and court findings, the trial court must consider all relevant evidence in making its decision upon the motion to modify custody. *Kelly v. Kelly*, 2002 ND 37, ¶ 22, 640 N.W.2d 38. However, that does not mean the trial court may ignore the two-part analysis required under N.D.C.C. § 14–09–06.6(6), i.e., first, whether a material change of circumstances exists and, second, if one does exist, whether a change is required in the best interests of the child.

[¶ 21] Although some of the findings of the trial court may lead one to conclude the trial court applied the "best interests" standard as in an initial custodial proceeding, the trial court in citing to the legal authority in its memorandum opinion clearly enunciated the proper legal standard and I read the trial court's findings in that light.

[¶ 22] GERALD W. VANDE WALLE, C.J., concur.

MARING, Justice, dissenting.

[¶ 23] I respectfully dissent. I am of the opinion that the trial court's decision to amend the judgment to change custody of the minor child from Ryan to Woods was clearly erroneous. The trial court misapplied the law to the facts, and I am left

with a definite and firm conviction a mistake has been made.

[¶ 24] On August 8, 2000, the trial court entered a judgment of divorce based on the stipulation of the parties awarding physical custody of the minor child to Ryan and visitation to Woods. The minor child was seven months old, having been born on December 21, 1999. Ryan, the mother, was eighteen years old at the time of the divorce, having been born on February 2, 1982. The record reflects that at the time of the divorce Ryan and the minor child were living with her parents and that she was unemployed.

[¶ 25] The record also reflects Ryan and her child lived with her parents from the time of the divorce up to the time Woods brought the motion to amend the judgment to change custody, except for one month in 2002 when she and the minor child moved to an apartment to live with her new husband, Chris Ryan.

[¶ 26] Woods moved for a change of custody on October 14, 2003. Ryan was, at that time, twenty-one years of age. The basis of Woods' motion was an allegation that Ryan had abandoned the minor child to the custody of the maternal grandparents. He also alleged she was chronically unemployed. After the motion was filed, Woods additionally alleged custody should be changed because of her traffic violations and criminal conviction of possession of drug paraphernalia. Woods alleged he could provide a stable environment because he was employed with the United States Air Force as a Staff Sergeant with ample earnings and a house.

[¶ 27] The trial court granted an evidentiary hearing and, on August 5, 2004, an amended judgment granting Woods' motion for a change of custody was entered based on the trial court's memorandum and order dated July 28, 2004. The trial court found that there has been a material change in circumstances. The trial court based its conclusion on Ryan's chronic unemployment for three years, her financial reliance on her parents, her "numerous convictions and time of arrest involved," and Woods' recent marriage and stable lifestyle. After concluding there had been a material change in circumstances, the trial court proceeded to "examine whether a change in custody is necessary to serve the best interests of [the child]." It is at this point in the trial court's analysis that I believe the trial court misapplied the law.

[¶ 28] Modification of custody of a child is set forth in N.D.C.C. § 14–09–06.6(6). If the trial court concludes there has been a material change in circumstances, it must decide whether a change in custody is necessary to serve the best interests of the child. N.D.C.C. § 14–09–06.6(6)(b).

> As we have stated, the use of "necessary" in the codification of the second step of the two-step test did not signal a departure from the standard embodied in our case law. *Holtz v. Holtz*, 1999 ND 105, ¶ 10, 595 N.W.2d 1 ("This part of the statutory formulation essentially tracks the two-step approach previously used by this Court for deciding a change of custody case."). Since N.D.C.C. § 14–09–06.6(6) became effective, we have continued to reference our prior case law, and we have sometimes substituted "require" or "compel" for the statutory language of "necessary" when reciting the second step of the test.

*Kelly v. Kelly*, 2002 ND 37, ¶ 16, 640 N.W.2d 38 (citations omitted). Our Court has said:

> In a motion to modify custody, the best interests of the child analysis requires two steps not required in an original custody decision. First, the best interests of the child factors must be

gauged against the backdrop of the stability of the child's relationship with the custodial parent, because that stability is the primary concern in a change of custody proceeding. Second, after balancing the child's best interests and stability with the custodial parent, the trial court must conclude that a change in the status quo is required. A child is presumed to be better off with the custodial parent, and close calls should be resolved in favor of continuing custody. A change should only be made when the reasons for transferring custody substantially outweigh the child's stability with the custodial parent.

*Myers v. Myers*, 1999 ND 194, ¶ 10, 601 N.W.2d 264 (citations and emphasis omitted).

[¶ 29] The best interests of the child factors are set forth in N.D.C.C. § 14–09–06.2(1):

1. For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

   a. The love, affection, and other emotional ties existing between the parents and child.

   b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

   c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

   d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

   e. The permanence, as a family unit, of the existing or proposed custodial home.

   f. The moral fitness of the parents.

   g. The mental and physical health of the parents.

   h. The home, school, and community record of the child.

   i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

   j. Evidence of domestic violence. In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. . . .

   k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

   l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

   m. Any other factors considered by the court to be relevant to a particular child custody dispute.

In the instant case, the trial court concluded that factors a, b, d, e, h, and m favor neither Woods nor Ryan. Thus, the trial court concluded factor d, which is the "length of time the child has lived in a stable satisfactory environment and the

desirability of maintaining continuity" and factor e, which is the "permanence, as a family unit, of the existing or proposed custodial home" favored neither the custodial mother, Ryan, nor the noncustodial father, Woods. In *Stoppler v. Stoppler*, 2001 ND 148, 633 N.W.2d 142, our Court stated: "[e]ssentially, factor d addresses past stability of environment, including a consideration of place or physical setting, as well as a consideration of the prior family unit and its lifestyle as part of that setting. It also addresses the quality of that past environment, and the desirability of maintaining continuity." *Id.* at ¶ 9. We have also said that "[f]actor e, on the other hand, deals with future prospects for permanence as a family unit." *Id.* The trial court in the instant case found both parents on equal footing on these factors stating merely:

> The reason Factors "d" and "e" are a draw is that [Ryan] and Barbara each testified [Ryan] will move out of the Rust's residence at 1105 5th Ave NW once [Ryan] is financially on her feet and that she did so in 2003 only to move back. Additionally, [Woods] even though there was testimony of some gaps in his visitation, did exercise a lot of visitation with [the child] when [Ryan] allowed him to do so.

Our Court has recognized that under factor d, a very important aspect of stability is the child's relationship with the "closest, nurturing parent," siblings and others. *See Roen v. Roen*, 438 N.W.2d 170, 174 (N.D.1989); *Kjelland v. Kjelland*, 2000 ND 86, ¶ 10, 609 N.W.2d 100; *Swanston v. Swanston*, 502 N.W.2d 506, 509 (N.D. 1993). The trial court appears to equate the relationship of the parent who cares for the child on a daily basis with the relationship of the parent who has visitation with the child. Factor d relates to the past custodial relationship and environment, and factor e looks to the proposed

parent-child relationship and environment. I believe the trial court has an erroneous view of the law and failed to properly consider factors d and e.

[¶ 30] The trial court concluded three factors, i, j, and m, were not applicable to this case. The trial court found factors c, f, and g favored Woods. Factor c is "[t]he disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs." The trial court found: "When compared to [Ryan] and her dependence on her parents, Factor 'c' favors [Woods] by his earnings from his employment."

[¶ 31] The record indicates Ryan has lived with her parents since the divorce except for one month when she and her child lived with her new husband, Chris Ryan. Ryan was eighteen years old when she was divorced from Woods and, over the next three years, she obtained two jobs and was primarily financially supported by her parents. She testified she did do housework for her parents to assist in her support. The record does not reflect her education level, but it supports she was pregnant by Woods when she was seventeen years old. She testified she worked for a time at a Dairy Queen before her divorce.

[¶ 32] Ryan is confronted with a Hobson's choice. The trial court finds that she does not have the disposition to provide her child with food, clothing, medical care or other material needs, because she is unemployed. Yet, if she was employed, she would need to place her child in daycare or with the child's grandparents during her work hours. She then conceivably could be found to lack the necessary disposition to give her child guidance, love, and affection because of her devotion to work

and inability to be with her child. The mother is placed in a "Catch–22" situation because she is penalized for staying at home in that she is unable to provide the child material advantages and also penalized for working outside the home in that she lacks devotion to her child. Gender-neutral principles are violated when a court places too much weight on economic factors. *See* 2 Sandra Morgan Little, *Child Custody & Visitation Law and Practice* § 10.09[5][d] (2004). Under our Uniform Juvenile Court Act, a finding of poverty is not sufficient to establish a child is without proper parental care. *See* N.D.C.C. § 27–20–02(8)(a). The American Law Institute's *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 2.12, p. 285 (2000) prohibits consideration, in issuing a custody order, the parents' financial circumstances, except in very limited circumstances. Ryan is penalized as a parent because she has parents who can afford to support her so she can stay home with her child. Ryan and her parents have made that choice. Otherwise, she would be forced to either seek public assistance or seek minimum wage employment, place her child in the care of others and possibly incur substantial debt.

[¶ 33] In the present case, there is absolutely no evidence that Ryan's personal poverty is causing or may cause harm to the child or affects the stability of their relationship. The record indicates the child has adequate clothing, toys, books, food, his own bedroom, and a bicycle with training wheels. His medical needs are met. The record indicates Ryan is present daily to take care of her child and to teach him. Ryan's mother, the child's grandmother, works during the day. Ryan does housework for her. These are the activities of a "stay-at-home mom." The trial court states: "Sadly, [Ryan] and her mother appear to be content for over three years for [Ryan] to live off her parents." The trial court seems to make a value judgment about the fact that Ryan is in a position where she does not need to work to support her child. The trial court completely fails to analyze whether Ryan's unemployment adversely affects her child's basic needs for food, clothing, or medical care, but rather passes subjective judgment on the fact that Ryan's parents allow her "to live off" them while she cares for her child. Ryan, through her arrangement with her parents, provides the necessities for her child. The record indicates that Ryan plans to move out of her parents' home if she can find employment that will make the move financially feasible. I am of the opinion the trial court has an erroneous view of the law and that there is no evidence in the record to support its conclusion that the mother's lack of steady employment necessitates a change in the custody of a well fed, clothed, and cared for child. *See Blotske v. Leidholm*, 487 N.W.2d 607, 609 (N.D.1992) (holding "[t]here is an 'aversion' to changing the custody of a happy child who has been living with one parent for a substantial time").

[¶ 34] Factor f is "[t]he moral fitness of the parents." The trial court found "[Woods'] stable lifestyle shines under Factor 'f' when compared to [Ryan's] very hectic 2003 which saw her arrested a number of times—even late at night, her secret marriage and move out of her parents' home only to separate from her spouse and move back home less than a month later." The trial court again fails to analyze whether these changes in circumstance have an adverse impact on the child's welfare. A court should not presume harm based on a new marriage and living arrangement that did not last because of financial stress. Because the trial court discusses Ryan's remarriage under

"moral fitness" of the parents, it is unclear just what its basis is for finding the factor favorable to Woods. The more "enlightened view" is to prohibit the presumption of harm based on sexual relationships of a parent and to allow consideration only when there is a showing of specific harm to the child. *See* American Law Institute, *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 2.12, Comments, pp. 283–84 (2004); *Foreng v. Foreng*, 509 N.W.2d 38, 40 (N.D. 1993) (upholding custody award to mother, whose extramarital relationship was not shown to be detrimental to the children); *see also Nefzger v. Nefzger*, 1999 ND 119, ¶ 15, 595 N.W.2d 583 (rejecting the suggestion that extramarital relationships are an irrefutable indication of lack of moral fitness). The remarriage of a parent ordinarily does not warrant a change of custody, because remarriage is a frequent occurrence and the "[c]onsideration of it as grounds for modification introduces considerable instability into custodial arrangements." *See* American Law Institute, *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 2.15, Comment f, p. 338 (2004). In the instant case, there is no record evidence that there was any damage to the emotional or physical well-being of the child because he and his mother lived with her new husband for one month in an apartment. There is also no evidence that Ryan's remarriage has an adverse affect on the parent-child relationship.

[¶ 35] Under factor f, "moral fitness" of the parents, the trial court also cited Ryan's 2003 arrests and that they occurred late at night. The evidence in the record is that in 2003 Ryan had one conviction for driving under suspension on June 13, 2003, and she was convicted of possession of drug paraphernalia on June 17, 2003. Ryan testified she pled guilty to the possession of drug paraphernalia. She testi-

fied a friend handed her a pack of cigarettes in which there was some type of drug paraphernalia, which was not hers but in her possession. She was charged at 1:53 a.m. on that occasion. Lastly, she was charged with criminal mischief, but the charge was dismissed once it was evident only one individual was involved. That charge occurred at 1:15 a.m. on Saturday, May 4, 2003. At all these times, her son was with her parents and not present. There is no evidence Ryan uses drugs. She has received fines for these offenses and has not received jail time. There is no evidence she has ever been in jail overnight when arrested. Ryan testified she goes out in the evening socially approximately three times a month and when she does her parents take care of her child.

[¶ 36] When analyzing conduct under "moral fitness":

> Commentators recommend that a court should not find a direct adverse impact unless a preponderance of the evidence shows that parental conduct is presently affecting, is probably presently affecting, or is probably about to affect the child, and that the effect is actually harmful. Such a standard would help ensure a custody decision based on the child's best interest rather than a subjective reaction to parental moral values.

2 Sandra Morgan Little, *Child Custody and Visitation* § 10.12[2][b](2004). "The recommended standard would bar courts from considering speculative, long-range future impact, ..." *Id.* The Michigan Supreme Court, in interpreting virtually an identical factor f stated: "Thus, the question under factor f is not 'who is the morally superior adult'; the question concerns the parties' relative fitness to provide for their child, given the moral disposition of each party as demonstrated by individual

conduct." *Fletcher v. Fletcher*, 447 Mich. 871, 526 N.W.2d 889, 896 (Mich.1994).

[¶ 37] Although the mother has socialized in the evenings, there is no evidence the child was ever not well cared for or left alone. *See Nefzger*, 1999 ND 119, 595 N.W.2d 583 (holding the trial court could properly view the mother's marijuana use as not being indicative of bad character which would adversely affect the children and that alcoholism does not pose a complete bar to custody when there is no evidence it interfered with the ability of the mother to care for the children). In the present case, evidence is lacking of an adverse impact on the child or the parent-child relationship. I am of the opinion that the trial court has an erroneous view of the law and that there is no evidence to support its conclusion the change in circumstances necessitates a change of custody.

[¶ 38] Factor "g" is "[t]he mental and physical health of the parents." The trial court concluded:

> Factor "g" favors [Woods] since [Ryan] has experienced some 3 years of chronic unemployment and in less than a 30–day period in 2003, she moved out of the [sic] her parents house, became pregnant by her unemployed spouse, and found it necessary to move back home and thereby separated from her new spouse. Such a series of events certainly has to take a toll mentally on any sane and strong person. Such a toll was noted in [Ryan's] demeanor at the January hearing.

Apparently, the trial court concluded based on the testimony that Ryan was emotionally or mentally impaired. There was no expert testimony evaluating Ryan's mental health. "Because the child's best interest is the foremost consideration, the mental health of a parent seeking custody is relevant only to the extent it can be shown to adversely affect the child's best interest." 2 Sandra Morgan Little, *Child Custody and Visitation* § 10.11[2][d](2004); *see Mayo v. Mayo*, 2000 ND 204, ¶ 25, 619 N.W.2d 631 (affirming change of custody because expert testimony supported that mother's health problems affected the emotional health of the child). Although the mother, Ryan, has made some unwise choices, which reflect poorly on the maturity of her judgment, there is no evidence in the record that her conduct has had any detrimental affect on the child or that it probably will have an adverse effect. To conclude otherwise is to speculate on the possibility the mother will be a bad influence on the child. This is not an original custody determination. Although the trial court paid lip service to its responsibility to weigh the best interest factors against the stability of the custodial parent-child relationship, I am of the opinion it failed to correctly apply the law. It did acknowledge that the mother, Ryan, has a good relationship with the child and that she has been his only primary caregiver; however, the trial court then stated the stability factor was "diminished" because Ryan may move out of her parents home and the father has a solid relationship with the child as a result of his visitation.

[¶ 39] The evidence in this case is that the child is a "very happy" child. The record supports that Ryan "feeds him well," he is "well dressed," "clean and happy" and lives in a stable home environment. He is loved by his grandparents. He is loved by his great grandparents who live three blocks from him. There is a school three and a half blocks from his home. Although a court need not wait until the environment of a child adversely affects the child to order a change in custody, the question should be whether there is a reasonable likelihood of an adverse affect on the child if kept in his present surroundings. The trial court must weigh

the harm to the child if the child remains in the environment, against the harm to the child if it disrupts the stability of the child's relationship with the custodial parent. *See Myers,* 1999 ND 194, ¶ 10, 601 N.W.2d 264. The presumption is in favor of the custodial parent to promote stability and continuity in the child's life. The burden is on the noncustodial parent to prove that the nonexistence of the presumed fact is more probable than its existence. N.D.R.Ev. 301. The trial court fails to correctly analyze the presumption in favor of maintaining the status quo with the custodial parent and fails to require the noncustodial parent to carry the burden of proof. Here, I believe Woods has failed to meet his burden.

[¶ 40] The trial court discusses the changes in circumstances without ever analyzing whether any of them adversely affect the child necessitating a change of custody. Only when the adverse effects on the child "substantially outweigh the child's stability with the custodial parent" should custody be changed. *Myers,* at ¶ 10. Not all changes in circumstances require a change in custody.

[¶ 41] Because the trial court failed in its analysis to properly balance the child's best interests against the presumption of maintaining the stability of the custodial parent-child relationship and then to weigh whether a change of custody is compelled, I respectfully dissent. I would reverse the amended judgment changing custody because there is no evidence in the record to support that the changes in circumstances have adversely affected the child or that there is a reasonable likelihood they will adversely affect the child.

[¶ 42] MARY MUEHLEN MARING, J.